583 F.Supp. 427 (1984)
CONTINENTAL CABLEVISION, INC., Plaintiff,
v.
STORER BROADCASTING COMPANY, Defendant.
No. 83-2116C(1) (formerly No. 81-MISC-101).
United States District Court, E.D. Missouri, E.D.
March 30, 1984.
*428 Richard Walters, St. Louis, Mo., for plaintiff.
L. William Higley, Carroll J. Donohue, St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
This case is now before this Court on the motion of Ms. Mary (Jari) Jackson (hereinafter "Movant") to quash a deposition subpoena served upon her by defendant Storer Broadcasting Company (hereinafter "Storer"). Movant, a newspaper reporter, contends that the subpoena must be quashed because Storer seeks discovery of matters which are qualifiedly privileged from discovery by the first amendment to the United States Constitution. U.S. Const. amend. I.

I. FACTUAL BACKGROUND
The present motion to quash arises out of a diversity action styled The Continental Cablevision, Inc. v. Storer Broadcasting Company, No. 80-2929, currently pending in the United States District Court for the District of Massachusetts. In that case, plaintiff Continental Cablevision, Inc. (hereinafter "Continental"), alleges that one of Storer's employees libeled Continental in November, 1980, by distributing a written statement (the "Warner Statement") to members of the Florissant, Missouri, City Council. Continental further *429 alleges that the statement was false and caused the Florissant, Missouri, City Council to reject Continental's application for the Florissant cable television franchise and to accept Storer's application. Continental also alleges that the Warner Statement caused Continental to lose other cable television franchises in the St. Louis area. Storer filed a counterclaim for abuse of process, alleging that Continental's action was brought without cause, in bad faith and for an improper purpose.
As part of its discovery, Storer submitted interrogatories to Continental, including the following, seeking the basis for its claim that franchises were lost as a result of the alleged libel:
15. Please list each application for a cable television franchise that Continental claims was denied or otherwise affected as the result of statements alleged in the Complaint to be libelous, and state separately with respect to each:
a) the source of support for Continental's claim that the franchise was denied as the result of the allegedly libelous statement;
b) the identity of any person who has provided Continental with information in support of its claim that the franchise was denied as the result of the allegedly libelous statement; ...
e) describe the information provided to Continental.
In response to this interrogatory Continental identified Movant as a source for the allegation that the Warner Statement caused Continental to lose the Florissant and other franchises:
(a) Continental contends that publication of the libelous statements set forth in the complaint was a proximate cause of the denial of its application for cable television franchises in Florissant and in the unincorporated areas of St. Louis County (Areas A and B) ....
(b) In addition to information apprehended or developed by Continental itself, and inferences drawn therefrom, information supporting its contentions as to denial of the Florissant and St. Louis County franchise applications has been provided by ... Jari Jackson, a reporter for the St. Louis Globe-Democrat ....
(e) ... In early January, 1981 Ms. Jackson informed Mr. Clancy, Mr. Schleyer and Ms. Kuper that she believed rumors that Continental was experiencing financial difficulties and was "for sale", arising after publication of the libelous material in Florissant, had hurt Continental's chances of obtaining both the Florissant and the St. Louis County franchises.
Thereafter, Storer submitted requests for production of documents to Continental and Continental provided a series of memoranda written by the three Continental employees identified in its answer to Interrogatory 15(e), above, and by its local lobbyist, Nathan Kaufman. These memoranda purport to describe conversations they had with Movant in January, 1981. The memorandum of Bonnie J. Kuper states: Ms. Kuper spoke with Movant on January 5, 1981, at 3:00 p.m.; Movant informed Ms. Kuper that Movant had heard rumors that Continental was for sale; and Movant informed Ms. Kuper that in Movant's opinion these rumors had damaged Continental's likelihood of winning any contracts in the unincorporated areas of St. Louis County. The memoranda of Mr. Kaufman, Mr. Clancy and Mr. Schleyer all relate the contents of a conversation between them and Movant on January 5, 1981, at 7:30 p.m. at the University City  Council Chambers meeting. According to these memoranda, Movant told them that she was hearing rumors from "higher-ups", "high officials", and "high places", that Continental was experiencing financial difficulties and was for sale. All three memoranda state that Movant expressed her opinion that these rumors had "hurt [Continental] in St. Louis County". In addition, Mr. Schleyer's memorandum contains these additional comments:

*430 ... [Movant] indicated that she felt the rumors had hurt our chances in Florissant.
A subsequent call to [Movant] on Wednesday, January 7, indicated further clarification of this matter. It was her impression that the County Council considered our alleged financial difficulties in their decision. Furthermore, Bob Luechen [another reporter] indicated to [Jari] that prior to the County Council's decision some kind of literature was distributed to County Council members regarding the sale or financial status of Continental.
[Movant] then went on to state, without specifics, that other community officials and other cable company officials believe us to be for sale.
Her final comments were that these rumors were very much a factor in convincing people (Council members) which way to go.
Defendant Storer Broadcasting Company's Memorandum In Opposition To Motion To Quash Subpoena of Mary Jackson, Attachment I at 5 (emphasis in original).
Storer then proceeded to depose Mr. Clancy and Mr. Schleyer. Mr. Clancy testified that the substance of his conversation with Movant was as stated in his memorandum, that Movant did not relate the basis for her alleged statement, that he did not consider his conversation with Movant to be confidential, and that the only persons present during the alleged conversation were Movant, Mr. Kaufman, Mr. Clancy and Mr. Schleyer. Mr. Schleyer had no memory of the conversation beyond the contents of his memorandum.
Storer also deposed each of the Florissant, Missouri, City Council members at the time of the vote. According to Storer, each denied that the Warner Statement had any effect on their ultimate decision.
In March, 1983, Storer served a deposition subpoena on Movant, a reporter for the St. Louis Globe-Democrat, to appear for an oral deposition on March 23, 1983. Movant filed a motion to quash that subpoena on the ground that the information sought was privileged by the first amendment to the Constitution. Specifically, Movant alleged that she had gathered information and written several stories concerning the competition for cable franchises in the St. Louis area, and that some of the information gathered "was obtained from sources with whom Movant had an explicit or implicit understanding or agreement of confidentiality or non-disclosure." Memorandum In Support Of Motion To Quash at 2. In addition, Movant stated that the questions sought to be submitted to Movant on deposition included her sources for an article written by Movant and published on January 9, 1981, concerning the present litigation. Id. at 3. The motion to quash was sustained by Judge Wangelin of this district. However, Judge Wangelin's ruling was expressly made without prejudice to further efforts of Storer to depose Movant.
On April 26, 1983, Storer noticed Movant's deposition upon written questions and served a subpoena to require her attendance to testify. Cross-questions were served on Continental on or about May 31, 1983. A copy of those direct and cross-questions are attached to this Memorandum as Appendix A and B respectively. Storer's direct questions cover the following general categories: 1) background information (questions 1-5 and 15); 2) the substance of Movant's communications to Continental or its employees regarding the effect of the Warner Statement (questions 6, 7, 9, 10, 12 and 13); 3) the substance of Continental's or its employees' communications to Movant (questions 8, 11, 14, 16, 17, 18 and 19); 4) the basis upon which Movant asserts that there was an express or implied agreement of confidentiality with regard to the above information or its source (questions 8(b), 11(b), 17(c) and 20(c)); and 5) whether the information sought was ever disclosed to third parties (question 20(c)). Continental's cross-questions basically expand on Storer's direct questions.
Movant then filed the instant motion to quash the subpoena compelling her to testify.

*431 II. DISCUSSION
Movant contends that the testimony which Storer and Continental seek is privileged and is therefore not subject to discovery. Movant argues that she is entitled to claim a federal common law privilege for a reporter's unpublished information, whether confidential or not. Movant states that the scope of this alleged privilege covers the deposition questions because they seek the contents of her communications with various persons, the sources for her January 9, 1981 article, and the factual basis for her claimed privilege of non-disclosure or confidentiality. Movant claims that the first two (2) categories of information are privileged. As to the third category, apparently, it is her position that once a reporter has invoked the privilege the burden shifts to the party seeking discovery to satisfy a three (3) part balancing test, which focuses upon the information sought, the relevancy of the information to the issues in the case, and the extent to which alternative, non-privileged sources have been exhausted. Movant contends that only after said test has been satisfied, may a court require a reporter to support his/her claim of confidentiality. Movant concludes by arguing that Storer does not satisfy the three (3) part test in the case at bar and therefore the motion to quash should be granted.
Storer responds by initially pointing out that this is a diversity case and that federal common law is inapplicable to the issue of evidentiary or discovery privileges. According to Storer, neither the law of Missouri nor that of Massachusetts provides a privilege for the information sought here. Storer argues that the only basis of Movant's asserted privilege is the first amendment to the Constitution and that the scope of the first amendment privilege for newspaper reporters is limited to disclosure of confidential sources. Storer concludes that because none of the questions that it seeks to put to Movant call for the disclosure of confidential sources, she is not entitled to claim the privilege. In addition, Storer argues that Movant has the burden of at least making a prima facie showing that the answers to the questions will require her to divulge the identity of sources with whom she has an agreement of confidentiality. Finally, Storer argues, in the alternative, that it has satisfied the three (3) part balancing test for determining when to override the reporter's qualified privilege.
The arguments of Movant and Storer require this Court to answer several questions. First, what is the legal source of the privilege claimed by Movant? Second, what is the scope of that privilege? Third, how is that privilege claimed by a reporter? Finally, this Court must apply these principles to the facts of this case and determine whether Movant should be required to answer the questions served by Storer and Continental.

A. LEGAL SOURCE OF THE REPORTER'S QUALIFIED PRIVILEGE
At the outset, this Court must address the question of the source of the privilege claimed by Movant. Even though this case is pending in a federal court solely on the basis of diversity of citizenship of the parties, Movant argues that federal common law is the source of the privilege. However, Movant's argument must be rejected. Under the Erie doctrine, it is axiomatic that in suits that are in federal court on the basis of diversity of citizenship, federal law governs procedural questions and state law governs substantive questions. Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The testimonial privilege of a witness is a substantive question, and this rule has been codified in Federal Rule of Evidence 501:
... [I]n civil actions and proceedings, with respect to an element of a claim or defense as to which state law supplies the rule of decision, the privilege of a witness, person, government, state, or political subdivision thereof, shall be determined in accordance with state law.
*432 Fed.R.Civ.P. 501. State law governs both plaintiff's claim and defendant's defenses and counterclaim. Under Klaxon Co. v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), a federal court sitting in diversity must apply the choice-of-law rules of the forum state.
In the case at bar, however, it is of no consequence whether this Court applies the law of Missouri or Massachusetts to Movant's claim of privilege. It is undisputed that neither state has a so-called "shield" statute or a common law reporter's privilege. Because state law does not support Movant's privilege and because federal common law is inapplicable to this diversity suit, the only possible source of the privilege claimed by Movant is the first amendment to the United States Constitution. Miller v. Transamerican Press, Inc., 621 F.2d 721, 724-25 (5th Cir.1980). Therefore, in passing on Movant's claim of privilege, this Court's focus is limited to the protection afforded to reporters by the first amendment guarantee of a free press.

B. SCOPE OF THE REPORTER'S QUALIFIED FIRST AMENDMENT PRIVILEGE
The first amendment to the Constitution guarantees a free press. Because the process of newsgathering is essential to a free press, a qualified privilege to refuse to divulge the identity of confidential sources has been recognized in favor of news reporters. One of the earliest decisions to recognize this so-called privilege was Garland v. Torre, 259 F.2d 545 (2d Cir.), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958). In Garland, Judy Garland brought a defamation suit against Columbia Broadcasting System, Inc., and she sought to obtain the identity of a reporter's confidential source. The court stated:
[W]e accept at the outset the hypothesis that compulsory disclosure of a journalist's confidential sources of information may entail an abridgement of press freedom by imposing some limitation upon the availability of news.
Id. at 548. However, the court also recognized that an important countervailing interest was involved  "the duty of a witness to testify in a court of law ..." Id. As the court stated, this duty of every citizen to offer his testimony, and the "correlative right of a litigant to enlist judicial compulsion of testimony", id. at 549:
"has to do with the power of the state to discharge an indispensable function of civilized society, that of adjudicating controversies between its citizens and between citizens and the state through legal tribunals in accordance with their historical procedures."
Id. (quoting Bridges v. California, 314 U.S. 252, 291, 62 S.Ct. 190, 207, 86 L.Ed. 192 (1941)). The Garland court struck the balance between these competing interests in favor of compelling disclosure of the confidential source, but the court was careful to point out that the identity of the source "went to the heart of the plaintiff's claim." Id. at 550.
The Supreme Court has considered the existence of a reporter's first amendment privilege on two occasions. In Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Court held that a journalist does not have an absolute first amendment privilege to refuse to disclose confidential sources to a criminal grand jury, despite the potential interference with the newsgathering process. However, the Court did suggest that the first amendment might provide a journalist with protection from disclosing confidential sources in some circumstances. Id. at 707, 92 S.Ct. at 2669. In fact, Justice Powell suggested that all reporter privilege questions should be resolved on a case-by-case basis utilizing a balancing analysis that considers both the constitutional interests and the obligation of all citizens to give relevant testimony. Id. at 710, 92 S.Ct. at 2671.
The second Supreme Court case was Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). In Lando, the Court held that the press does not have a first amendment privilege against discovery of mental and editorial processes in *433 a libel case where there is a media defendant. In Lando, the Court balanced the need of the plaintiffs to inquire into the defendant's thought processes against the effect that such an intrusion would have upon the functioning of a free press.
Despite these results in the Supreme Court, the "hypothesis" set forth in Garland is now well-established. The weight of authority supports the proposition that a news reporter has a qualified privilege, based upon the first amendment, to refuse to disclose the identity of confidential informants or sources. See, e.g., In re Selcraig, 705 F.2d 789 (5th Cir.1983); United States v. Burke, 700 F.2d 70 (2d Cir.1983); In re Petroleum Products Antitrust Litigation, 680 F.2d 5 (2d Cir.), cert. denied, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); Zerilli v. Smith, 656 F.2d 705 (D.C.Cir.1981); United States v. Criden, 633 F.2d 346 (3d Cir.1980), cert. denied, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981); United States v. Cuthbertson, 630 F.2d 139 (3d Cir.1980), cert. denied, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); Riley v. City of Chester, 612 F.2d 708 (3d Cir.1979); Cervantes v. Time, Inc., 464 F.2d 986 (8th Cir.1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 939, 34 L.Ed.2d 257 (1973); Williams v. American Broadcasting Companies, Inc., 96 F.R.D. 658 (W.D.Ark.1983); Liberty Lobby, Inc. v. Anderson, 96 F.R.D. 10 (D.D.C.1982). This Court is persuaded by these decisions and, accordingly, holds that a news reporter has a qualified privilege to refuse to reveal the identity of confidential sources.
Generally, once the privilege has been properly invoked, it can be overcome by satisfying a three (3) part balancing test:
First, the movant [seeking to override the privilege] must demonstrate that he has made an effort to obtain the information from other sources. Second, he must demonstrate that the only access to the information sought is through the journalist and her source. Finally, the movant must persuade the court that the information sought is crucial to the claim.
United States v. Criden, 633 F.2d at 358-59. It is easier for a party seeking to overcome the privilege to do so in a criminal trial or grand jury situation, or in a civil libel case where there is a media defendant, than in a civil case where the reporter is a non-party. See generally, J. Barron and C. Dienes, Handbook of Free Speech and Free Press at 406-479 (1979). This is because the "paramount public interest in the maintenance of a vigorous, aggressive and independent press", United States v. Burke, 700 F.2d at 77, is more likely to outweigh the duty to testify and the private interests in civil litigation where the reporter is a non-party. Zerilli v. Smith, 656 F.2d at 712.
However, the existence of a qualified reporter's privilege is not seriously in doubt in this case. Storer as much as admits that such a qualified privilege exists. The legal dispute on this motion to quash is the precise scope of the reporter's privilege. As discussed, supra, the general rule is that the privilege extends to protect the identity of a reporter's confidential sources. The rationale is akin to other privileges, such as the attorney-client privilege or the privilege of the government in a criminal case to withhold the identity of its informants:
[T]he press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired. Compelling a reporter to disclose the identity of a source may significantly interfere with this news gathering ability; journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant.
Zerilli v. Smith, 656 F.2d at 711. See also Branzburg v. Hayes, 408 U.S. at 693-95, 92 S.Ct. at 2662-63; Riley v. City of Chester, 612 F.2d at 714; Baker v. F & F Investment, 470 F.2d 778, 782 (2d Cir.1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973). In addition to confidential sources though, Movant contends *434 that the privilege also extends to what she characterizes as "unpublished information".
Movant relies primarily on United States v. Cuthbertson wherein the court stated:
We do not think that the privilege can be limited solely to protection of sources. The compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes. See Loadholtz v. Fields, 389 F.Supp. 1299, 1303 (M.D. Fla.1975). Like the compelled disclosure of confidential sources, it may substantially undercut the public policy favoring the free flow of information to the public that is the foundation of the privilege .... Therefore, we hold that the privilege extends to unpublished materials in the possession of CBS. See Altemose Construction Co. v. Building & Construction Trades Council, 443 F.Supp. 489, 491 (E.D.Pa.1977) ("this qualified privilege can even apply when the news source and, perhaps, a portion of the withheld writing, are not confidential"). Of course, the lack of a confidential source may be an important element in balancing the defendant's need for the material sought against the interest of the journalist in preventing production in a particular case.
630 F.2d at 147 (citation omitted). Several other courts agree that the first amendment interest in protecting the newsgathering process and the free flow of information to the public is not absent where discovery of non-confidential sources or nonconfidential resource materials is sought. See Maughan v. NL Industries, 524 F.Supp. 93, 95 (D.D.C.1981) (reporter's notes); In re Consumers Union of United States, Inc., 495 F.Supp. 582, 586 (S.D.N.Y. 1980) (inquiry into editorial process); Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Company, Inc., 455 F.Supp. 1197, 1203 (N.D.Ill.1978) (reporter's resource documents). Movant places particular reliance on Maughan, where the court quashed a subpoena which sought to compel production of unpublished notes and the tape recordings relating to an affirmative defense in a personal injury action in which the reporter was sought to be called as a non-party witness.
Having carefully considered these authorities, and mindful of the preferred position which first amendment interests hold in American society, this Court holds that the first amendment qualified reporter's privilege is not limited to discovery which seeks the revelation of confidential sources. The first amendment interest in preserving the vitality of the press is implicated any time civil litigants seek discovery or testimony from the media, regardless of whether confidential or non-confidential sources or materials are sought. However, this does not mean that discovery of non-confidential materials is entitled to the same protection as discovery of the identity of confidential informants. In applying the balancing test articulated in Criden, the nature of the discovery sought and the extent of its infringement on first amendment values must be the central focus. Thus, a lesser showing of need and materiality may be required in the situation where discovery of non-confidential material is sought than where the identity of confidential sources is sought. See Bruno & Stillman, Inc. v. Globe Newspaper Co., 224 Ct.Cl. 583, 633 F.2d 583, 597 (1st Cir. 1980) ("the court must assess the extent to which there is a need for confidentiality. Not all information is equally deserving of confidentiality".)
On the other hand, the first amendment does not render news reporters and other members of the media immune from the obligation of all citizens to provide relevant testimony in civil cases. For example, in Maughan, even though the court quashed the subpoena to produce unpublished notes and tape recordings, the court indicated that the reporter himself would be required to appear at his deposition and answer questions about the published article which appeared on the face of the article. 524 F.Supp. at 95. The court gave the following as two (2) examples of such questions: "whether it was truly published on the date asserted and whether he did in fact interview *435 plaintiffs ... before writing the article." Id. As to these types of questions the court stated that there would not be the same interference with first amendment rights as there would be in requiring the reporter to disclose his resource materials. Id. See also In re Selcraig, 705 F.2d at 799 & n. 15 (reporter required to testify where he is a "percipient witness"); Mize v. McGraw-Hill, Inc., 82 F.R.D. 475, 477-78 (S.D.Tex.1979) (reporter responded to interrogatories which did not require revelation of confidential source). Accordingly, there are some types of discovery or testimony as to which the qualified reporter's privilege is practically insignificant.
In sum, this Court holds that news reporters enjoy a qualified privilege, derived from the first amendment guarantee of a free press, to withhold from discovery in a civil case confidential or non-confidential sources, materials, or other information where such discovery would impinge on the ability of the media to gather and disseminate news. Said privilege may be defeated in a particular case where the party seeking discovery can demonstrate that the testimony, material or information sought is relevant enough, and otherwise unavailable, to outweigh the first amendment interest of the media. A balancing analysis is the benchmark.

C. PROCEDURE FOR PASSING ON A CLAIM OF REPORTER'S PRIVILEGE
A significant question raised by the arguments of Storer and Movant concerns the proper procedure that should be utilized to pass on Movant's asserted privilege. It is the opinion of this Court that a reporter is not entitled to completely ignore discovery requests in civil cases. In the case at bar, Movant steadfastly refused to either appear or otherwise cooperate with Storer's discovery efforts. The following statement from Solargen Electric Motor Car Corp. v. American Motors Corp., 506 F.Supp. 546 (N.D.N.Y.1981), is particularly apposite to Movant's conduct:
[T]he Court is greatly bothered by the unreasonable refusal of the journalists to even appear at their designated depositions, particularly from people who belong to a profession that continually espouses the people's right to know. These reporters cannot refuse to appear, and must instead respond to the subpoenas and assert whatever privilege they may properly invoke in response to particular questions.
Id. at 552. See also Silkwood v. The Kerr-McGee Corporation, 563 F.2d 433, 437 (10th Cir.1977) ("[A] reporter must respond to a subpoena ... [and] he must appear and testify. He may, however, claim his privileges in relationship to particular questions which probe his sources."). Thus, at the very least, Movant must appear at the deposition for which she has been subpoenaed and respond to questions, to the extent that she feels she can, and to assert her privilege only in response to specific questions.
Once a reporter claims the privilege, the question then becomes what, if anything, must that reporter demonstrate in support of the claimed privilege. Apparently, it is the position of Movant that once the privilege is asserted, the burden is entirely upon the party seeking discovery to justify forcing the reporter to comply. While first amendment interests are entitled to significant protection, this Court cannot accept Movant's position. In Bruno & Stillman, Inc. v. Globe Newspaper Co., 224 Ct.Cl. 583, 633 F.2d 583, 597 (1st Cir.1980), the court stated that while a party seeking discovery of a media defendant's confidential sources must establish relevance of the desired information, a media defendant has "the burden of establishing need for preserving confidentiality." (citing 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2043, at 301-02 (1970)). In Silkwood, the court held that, in passing on a reporter's claim of privilege, the court could compel a reporter to provide "a description which does not reveal information which is claimed to be privileged of the various documents and a description of the witnesses interviewed sufficient to permit *436 the court to carry out" the balancing analysis of the reporter's claim. 563 F.2d at 438. Also, in Liberty Lobby, Inc., the court held that the existence of a qualified first amendment reporter's privilege "does not mean that a journalist can deprive his opponent and the court of relevant information to determine whether the qualified privilege is being properly invoked, or whether this is the rare or exceptional case in which the disclosure of the source is critically necessary as going to the heart of the plaintiff's case without which justice would fail." 96 F.R.D. at 12. Finally, the court in Gilbert v. Allied Chemical Corp., 411 F.Supp. 505, 511 (E.D.Va.1976), stated that in claiming a qualified reporter's privilege, "[v]ague allegations of potential indication of confidential sources will not suffice."
These authorities support this Court's conclusion that a reporter must, in addition to claiming the privilege in response to specific requests or questions, provide a court with particularized allegations or facts that support his/her claim of privilege. For example, if the question directly asks the reporter to name the source for a particular published statement, the reporter is required to state by way of affidavit or otherwise under oath that he/she had an express or implied understanding of confidentiality with the source. If the question asks the reporter about the circumstances of a particular interview or the results of a particular investigation, the reporter is required to state with specificity how the answer sought might impinge upon his/her ability to gather news or otherwise implicitly reveal the identity of a confidential source. Only if a reporter provides such information can a court determine whether the reporter is properly invoking the privilege and whether the balance should be struck in favor of non-disclosure. See, e.g., United States v. Burke, 700 F.2d 70, 76 (2d Cir.1983) (reporter deposed prior to determining whether documents sought were privileged); Baker v. F & F Investment, 470 F.2d 778, 780 (2d Cir.1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973) (specific record made on whether reporter had confidentiality understanding with anonymous source); Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Company, Inc., 455 F.Supp. 1197, 1204 (N.D.Ill.1978) ("disclosure of material given by the news source to the news gatherer should be studied to ascertain if the material sought to be adduced was proffered on the assurance that either the source or the material itself would not later be revealed."). A contrary rule would give reporters an unfettered license to evade their duty to provide relevant evidence in a court of law. The status of reporter does not per se justify such a release from that civic duty. It is only when compliance with that duty unnecessarily impinges on first amendment interests that a reporter is relieved of that duty.
Therefore, it is only after a reporter makes a minimal prima facie showing that responding to discovery or testimonial requests will impinge on first amendment interests that the burden shifts to the party seeking discovery to demonstrate the efforts made to obtain the information elsewhere and the extent to which the information is relevant. Moreover, if the court cannot strike the balance on the basis of the showing made by the reporter and the party seeking discovery, a court may conduct in camera review of the information sought to the extent necessary. Cuthbertson, 630 F.2d at 148. See also United States v. Smalley, 9 Med.L.Rptr. 1252, 1253 (N.D.Tex.1983); In re Federal Skywalk Cases, 95 F.R.D. 477 (W.D.Mo.1982).
It is the opinion of this Court that these procedures adequately accommodate the important competing interests involved in the assertion of a reporter's privilege.

D. APPLICATION
Applying the above principles to the facts of this case, it is clear that Movant is not entitled to an order quashing the deposition subpoena. First of all, Movant must at least appear at her deposition and respond to each of the questions put to her by Storer and Continental. She must claim *437 the privilege in response to individual questions.
Second, Movant has failed to properly invoke the privilege. Movant's showing in support of the privilege consists merely of the allegation that she reported on cable franchises in the St. Louis area and had agreements of confidentiality with some of her sources in connection with that reporting. These are precisely the types of vague and conclusory allegations that Gilbert disapproved of. Movant's showing in support of her claim of privilege is particularly inadequate because she has refused to respond to the entire deposition rather than individual questions. If an answer is claimed to be privileged, Movant must make specific and particularized affirmations of fact in response to each question as to why and in what way the answer is alleged to be privileged. Only then can this Court attempt to balance Movant's first amendment interests against the interests of the parties to this litigation.
A brief examination of the questions put to Movant by Storer and Continental reveals, as a practical matter, why Movant's showing in support of her claim is inadequate. With respect to Storer's questions, numbers 1 through 5 are background questions and there is no argument that the answers are privileged. Questions 6 through 14 concern Movant's conversations with Kuper, Clancy, Kaufman and Schleyer. On the basis of Movant's showing it is unclear why her answers to these questions are alleged to be privileged. Each of these individuals has testified as to the fact and substance of their conversations with Movant and have further stated that they did not have an agreement of confidentiality with Movant. Each of the questions merely seeks to confirm whether in fact Movant told these individuals what they said she said. As to Movant's conversations with these individuals, there would seem to be little basis for asserting that answering questions 6 through 14 would infringe on the newsgathering process. Indeed, this situation is factually analogous to that in United States v. Criden, 633 F.2d 346 (3d Cir.1980), where the court stated:
the defendants probably should be required to prove less to obtain the reporter's version of a conversation already voluntarily disclosed by the self-confessed source than to obtain the identity of the source itself.
Id. at 358. Questions 16 through 19 concern whether Movant had any other discussions with Continental employees or whether any Continental employee gave Movant documents related to this suit. Questions 17 and 19 specifically seek the identity of persons, but on the basis of Movant's showing it is not clear whether she claims that these identities are confidential. If not, and Movant merely contends that it would require her to reveal unpublished information, this fact would be crucial to a proper balancing of the interests at stake. Question 15 asks whether Movant knew about the pendency of this suit on January 5, 1983 (1982?), and question 20 seeks the basis for Movant's claim of privilege, if any, and whether she ever disclosed any of the allegedly privileged material to third parties. There has been no showing how the answers to these questions would require Movant to reveal confidential sources or unpublished information. Movant refers to an article published on January 9, 1982, but none of Storer's questions on their face relate to that article and this Court has not even been provided with a copy of that article.
Continental's questions to Movant are a bit more searching than Storer's, but the vagueness of Movant's showing still makes it impossible for this Court to engage in a meaningful balancing analysis. Questions 5 through 10 merely inquire into the fact and substance of the conversations with Kuper, Kaufman, Clancy and Schleyer. Questions 1 through 4 inquire whether Movant ever had any conversations with other Continental employees or with anyone else concerning Continental's financial condition and the alleged rumors about Continental. Questions 11 through 18 inquire into Movant's factual basis for her statements to Kuper, Kaufman, Clancy and *438 Schleyer, as well as the identity of the so-called "higher ups" and the literature that Movant referred to in her statements. It is conceivable that answers to questions 1 through 4 and 11 through 18 might require Movant to divulge confidential sources, but on the basis of Movant's showing that is mere speculation on the part of this Court. Such speculation is not an appropriate foundation upon which to strike the balance between the competing and weighty interests involved herein.

III CONCLUSION
For the reasons stated above, Movant's motion to quash be and is denied. Movant must appear and respond to the deposition questions. If Movant seeks to invoke the qualified reporter's privilege, she must do so on a question-by-question basis and must make at least a minimal prima facie showing as to why and how the privilege is being properly invoked. Movant must appear for her deposition at a time and place that is mutually agreeable to Movant, Storer and Continental, but in no event shall said deposition take place more than thirty (30) days from this date.

ORDER
Pursuant to the Memorandum filed herein this day,
IT IS HEREBY ORDERED that Movant Mary (Jari) Jackson's motion to quash the subpoena to attend a deposition upon written questions be and is denied.
IT IS FURTHER ORDERED that Movant shall appear for her deposition at a time and place that is mutually agreeable to Movant, Storer and Continental, but in no event shall said deposition take place more than thirty (30) days from the date of this Order.
IT IS FURTHER ORDERED that Movant may invoke the qualified reporter's privilege during the course of said deposition, but only in response to specific questions. If Movant does claim the privilege in response to a particular question, Movant shall state with particularity the manner in which the answer to the question is alleged to be privileged and the factual basis, to the extent possible without revealing the allegedly privileged information, for the claim of privilege. If either Storer or Continental seek an order to compel Movant to respond, despite her claim of privilege, the party seeking said order shall so move within fifteen (15) days after the conclusion of said deposition. The party seeking said order shall support said motion with a memorandum, and affidavits where appropriate, discussing said party's efforts to obtain the information elsewhere, the extent to which the information is material to said party's claim or defense, and the reasons why Movant's claim of privilege should be rejected. Movant shall have seven (7) days from the filing of said party's motion to compel to file a memorandum in opposition.
IT IS FURTHER ORDERED that the parties' request for oral argument be and is denied.

APPENDIX A *439

PLEASE TAKE NOTICE that, in accordance with Rule 31 of the Federal Rules of Civil Procedure, defendant Storer Broadcasting Company will take the deposition upon written questions of Ms. Mary (Jari) Jackson, whose business address is c/o Globe-Democrat, 710 N. Tucker Boulevard, St. Louis, Missouri 63101. The questions to be propounded to Ms. Jackson are attached hereto as Exhibit I.
The deposition upon written questions will be taken on Friday, July 1, 1983 or such other date as shall be mutually agreed upon by counsel for the parties and Ms. Jackson, will commence at 10:00 a.m. and continue from day to day thereafter until completed. The deposition will be taken at the offices of Waller Reporting, Inc., Registered Professional Reporters, 411 North 7th Street, Suite 1301, St. Louis, Missouri, before a notary public or other person authorized by law to administer an oath.
You are invited to submit cross questions.
 STORER BROADCASTING COMPANY
 By its attorneys,
 /s/Richard C. Heidlage
 Edward F. McLaughlin, Jr.
 Peter L. Resnik
 Richard C. Heidlage
 Charles P. McGinty
 Herrick & Smith
 100 Federal Street
 Boston, Massachusetts 02110
 (617) 357-9000
DATED: April 26, 1983

EXHIBIT I
 UNITED STATES DISTRICT COURT
 DISTRICT OF MASSACHUSETTS
---------------------------------------------
CONTINENTAL CABLEVISION, INC., )
 )
 Plaintiff, ) CIVIL ACTION
 ) NO. 80-2929-S
 v. )
 )
STORER BROADCASTING COMPANY, )
 )
 Defendant. )
 )
---------------------------------------------
 DEPOSITION UPON WRITTEN
 QUESTIONS TO MARY (JARI) JACKSON
*440 Questions to be propounded by defendant Storer Broadcasting Company to Mary (Jari) Jackson, whose business address is c/o Globe-Democrat, 710 N. Tucker Boulevard, St. Louis, Missouri, before a notary public or other person authorized by law to administer an oath:

Definitions:
1. For purposes of these questions, the term "Continental" shall mean Continental Cablevision, Inc. and/or Continental Cablevision of St. Louis County, Inc.
2. For purposes of these questions, the term "identify" shall mean to state the individual's full name (unless stated in the question) and the individual's employer or, if self-employed, his or her occupation and business address, if known.

Questions to be Answered:
1. State your full name:
2. What is your home address?
3. By whom are you now employed?
4. What is your present position?
5. Please state by whom you were employed during the period November, 1980 through January, 1981 and state in what position you were so employed.
6. Directing your attention to the January 6, 1980 memo to file from Bonnie J. Kuper attached hereto as Exhibit A, please state whether on or about January 5, 1981, you told Ms. Kuper, in substance, that as a result of rumors that Continental was for sale its chances for any award of a cable television franchise in the unincorporated areas of St. Louis County were nilif Supervisor Gene McNary were to veto the County Council's cable vote.
7. If the answer to question 6 is anything but an unqualified "no":
(a) state what, if any, connection or association you understood Ms. Kuper had with Continental as of January 5, 1981;
(b) identify all other persons present at the time the statement was made;
(c) state the context in which you made the referenced statement;
(d) state to the best of your ability what you said to Ms. Kuper in the conversation in which the referenced statement was made;
(e) state your purpose for making the referenced statement and, if you assert that the statement was made for a journalistic or news-gathering purpose, set forth in what way you assert that the statement served a journalistic or news-gathering purpose.
8. If the answer to question 6 is anything but an unqualified "no":
(a) state what Ms. Kuper said to or asked you during the course of the conversation in which you made the referenced statement;
(b) state whether you had an implicit or explicit understanding or agreement of confidentiality or non-disclosure with Ms. Kuper and, if so, state the basis on which you believe such an understanding or agreement existed;
(c) state whether you made any notes of your conversation with Ms. Kuper and, if you did, state whether you have retained those notes.
9. Directing your attention to the January 6, 1981 letter to William Clancy from Nathan Kaufman attached hereto as Exhibit B and to the memorandum to file from W.E. Clancy dated January 7, a copy of which is attached hereto as Exhibit C:
(a) state whether on or about January 5, 1981 you told Mr. Kaufman, Mr. Clancy and/or Mr. Schleyer, in substance, that you continued to hear from higher ups or from high officials that Continental was for sale;
(b) state whether on or about January 5, 1981 you told Mr. Kaufman, Mr. Clancy and/or Mr. Schleyer, in substance, that reports that Continental was for sale had hurt Continental in St. Louis County.
10. If the answers to questions 9(a) and (b) are anything but an unqualified "no":
(a) identify Nathan B. Kaufman and set forth what connection or association, if any, you understood Mr. Kaufman *441 to have with Continental as of January 5, 1981;
(b) state what connection or association, if any, you understood that Mr. Clancy had with Continental as of January 5, 1981;
(c) state what connection or association, if any, you understood that Mr. Schleyer had with Continental as of January 5, 1981;
(d) identify all other persons present at the time the statements were made;
(e) state the context in which you made the referenced statements;
(f) state to the best of your ability what you said to Mr. Kaufman, Mr. Clancy and/or Mr. Schleyer in the conversation or conversations in which the referenced statements were made;
(g) state your purpose for making the referenced statements and, if you assert that the statements were made for a journalistic or news-gathering purpose, set forth in what way you assert that the statements served a journalistic or newsgathering purpose.
11. If the answers to questions 9(a) and (b) are anything but an unqualified "no":
(a) state what Mr. Kaufman, Mr. Clancy or Mr. Schleyer said to or asked you during the course of the conversation in which you made the referenced statements;
(b) state whether you had an implicit or explicit understanding or agreement of confidentiality or non-disclosure with Mr. Kaufman, Mr. Clancy or Mr. Schleyer and, if so, state the basis on which you believe such an understanding or agreement existed;
(c) state whether you made any notes of your conversations with Mr. Kaufman, Mr. Clancy or Mr. Schleyer and, if you did, state whether you have retained those notes.
12. Directing your attention to the January 9, 1981 note to file from W.T. Schleyer, a copy of which is attached hereto as Exhibit D:
(a) state whether on or about January 5, 1981 you stated to W.T. Schleyer, in substance, that Mr. Bob Luechen had heard rumors that Continental was for sale;
(b) state whether on or about January 5, 1981 you told Mr. Schleyer, in substance, that you felt that rumors that Continental was for sale had hurt Continental's chances in Florissant;
(c) state whether on or about January 7, 1981 you told Mr. Schleyer, in substance, that it was your impression that the County Council considered Continental's alleged financial difficulties in their decision;
(d) state whether on or about January 7, 1981 you stated to Mr. Schleyer, in substance, that you had been told by Bob Luechen that prior to the County Council's decision some literature was distributed to County Council members regarding the sale or financial status of Continental;
(e) state whether on or about January 7, 1981 you stated to Mr. Schleyer, in substance, that other community officials and other cable company officials believed Continental to be for sale;
(f) state whether on or about January 7, 1981 you stated to Mr. Schleyer, in substance, that rumors that Continental was for sale were very much a factor in convincing Council members which way to go.
13. If the answers to questions 12(a) through (f) are anything but an unqualified "no":
(a) identify all persons present at the time the statements were made;
(b) state the context in which you made the referenced statements;
(c) state to the best of your ability what you said to Mr. Schleyer in the conversations in which the referenced statements were made;
(d) state your purpose for making the referenced statements and, if you assert that the statements were made *442 for a journalistic or news-gathering purpose, state in what way you assert that the statements served a journalistic or news-gathering purpose.
14. If the answers to questions 12(a) through (f) are anything but an unqualified "no":
(a) state what Mr. Schleyer said to or asked you during the course of the conversations in which you made the referenced statements;
(b) state whether you made any notes of your conversations with Mr. Schleyer and, if you did, state whether you have retained those notes.
15. Please state whether you knew of the existence of this lawsuit as of January 5, 1983?
16. At any time did any Continental employee or other representative discuss this lawsuit with you?
17. If the answer to question 16 is anything but an unqualified "no":
(a) identify the Continental employee or representative who discussed the lawsuit with you;
(b) state what he/she said;
(c) state whether you had an implicit or explicit understanding or agreement of confidentiality or non-disclosure with the Continental employee or representative and, if so, state the basis on which you believe such an understanding or agreement existed;
(d) state whether you made any notes of your conversations with the Continental employee or representative and, if you did, state whether you have retained those notes.
18. Did any Continental employee or representative ever provide you with any documents, including pleadings, related to this lawsuit?
19. If the answer to question 18 is anything but an unqualified "no":
(a) please identify the documents provided to you by the Continental employee or representative;
(b) please state when the documents were provided to you; and
(c) please identify the person or persons who provided you with the documents.
20. If you decline to answer any of these questions on the ground of privilege, please state:
(a) the basis for the claim of privilege;
(b) the basis for your belief that you had an understanding or agreement of confidentiality or non-disclosure for the information sought;
(c) whether the information sought was ever disclosed to any third party and, if so, when and to whom.
 STORER BROADCASTING COMPANY
 By its attorneys,
 ___________________________________
 Edward F. McLaughlin, Jr.
 Peter L. Resnik
 Richard C. Heidlage
 Charles P. McGinty
 Herrick & Smith
 100 Federal Street
 Boston, Massachusetts 02110
 617/357-9000
April , 1983

EXHIBIT A

*443 At approximately 3:00 p.m., Monday, January 5th, I spoke with Jari Jackson, a reporter with the St. Louis Globe-Democrat. During our conversation, she informed me that she has heard recently and repeatedly from a number of sources that Continental is indeed for sale. She felt that as a result of these rumors, the company's chances for any award of the St. Louis County unincorporated areas were nilif Supervisor Gene McNary were to veto the County Council's cable vote.
This is not the first time Jari has mentioned hearing such rumorssince the Florissant decision. I recall having spoken with her at least three times on the matter, however, cannot recall the actual dates prior to this past Monday.
 Jim Wand
 Bill Schleyer
 Bob Ryan

EXHIBIT B

NATHAN B. KAUFMAN

ATTORNEY AT LAW

1602 EXECUTIVE BUILDING

515 OLIVE STREET

ST. LOUIS, MISSOURI 63101
(314)621-8363
 January 6, 1981
Mr. William Clancy
Continental Cablevision, Inc.
950 Lee Street
Des Plaines, Illinois 60016
Dear Bill:
A short note in re unsolicited comments which were made by Jari Jackson, a St. Louis Globe Democrat reporter, who was covering the University City meeting last night.
I felt the comments by Jari Jackson were enlightening. Her statement that she continues to hear that Continental Cablevision, Inc. is for sale was quite revealing. She said she heard this from some higher-ups, as I remember her phrase. This, I would assume, meant responsible people.
The most pointed observation she made was her statement "it hurt us in St. Louis County." It certainly did.
Jari Jackson has been covering cable television franchising in St. Louis County virtually from its beginning. She is a good reporter. Her comments should be viewed seriously.
 Cordially,
 /s/ Nathan
 Nathan B. Kaufman
NBK/k

EXHIBIT C

On Monday evening, January 5, 1981, Nathan Kaufman, Bill Schleyer, and I attended a meeting of the University City, Missouri City Council held at City Hall. We arrived at the Council Chambers at about 7:30 p.m. As we entered the Chambers, we were met by Jari Jackson, a reporter of the St. Louis Globe Democrat. After a short discussion on what the City Council was likely to do, Jari Jackson told us that she *444 was still hearing reports that Continental was for sale. I told her there was no truth to it. She said she knew because she had spoken to Mr. Grousbeck who told her it was untrue. I asked her who had told her and she said, "A number of high officials." She also told us these rumors had hurt us in St. Louis County.

EXHIBIT D

At approximately 7:30 p.m. on Monday, January 5th, I spoke with Jari Jackson in the presence of Bill Clancy at University CityCouncil Chambers. At that time she mentioned that she has been hearing several rumors that our company was for sale. She indicated that these rumors came from pretty high places in the County. She also indicated that another reporter, Bob Luechen, has heard several rumors.
In addition, Jari indicated that she felt the rumors had hurt our chances in Florissant.
A subsequent call to Jari on Wednesday, January 7, indicated further clarification of this matter. It was her impression that the County Council considered our alleged financial difficulties in their decision. Furthermore, Bob Luechen indicated to Jari that prior to the County Council's decision some kind of literature was distributed to County Council members regarding the sale or financial status of Continental.
Jari then went on to state, without specifics, that other community officials and other cable company officials believe us to be for sale.
Her final comments were that these rumors were very much a factor in convincing people (Council members) which way to go.
CC: W. Clancy
 R. Ryan
 J. Wand

APPENDIX B
 UNITED STATES DISTRICT COURT
 DISTRICT OF MASSACHUSETTS
-------------------------------------------
CONTINENTAL CABLEVISION, INC., )
 )
 Plaintiff, )
 )
 v. ) CIVIL ACTION
 ) NO. 80-2929-S
STORER BROADCASTING COMPANY, )
 )
 Defendant. )
 )
-------------------------------------------

CROSS QUESTIONS OF PLAINTIFF CONTINENTAL CABLEVISION, INC. TO BE PROPOUNDED TO DEPONENT MARY (JARI) JACKSON PURSUANT TO FED. R. CIV. P. 31
*445 Cross questions under Fed.R.Civ.P. 31 to be propounded by plaintiff Continental Cablevision, Inc. to Mary (Jari) Jackson, whose business address is c/o Globe-Democrat, 710 N. Tucker Boulevard, St. Louis, Missouri, and answered before a notary public or other person authorized by law to administer an oath:

Definitions:
1. For purposes of these questions, the term "Continental" shall mean Continental Cablevision, Inc. and/or Continental Cablevision of St. Louis County, Inc.
2. For purposes of these questions, the term "identify" shall mean to state an individual's full name, address and employer or, if self-employed, his or her occupation and business address, if known.

Cross questions:
1. Apart from any conversations referred to, identified or described in questions propounded on direct examination by Storer Broadcasting Company, ("direct questions") or in your answers to those questions, did you, in 1980 or 1981, have any conversation with any Continental employee or other representative in which Continental's financial condition or proposed sale, or rumors or statements concerning either of these subjects, were discussed?
2. If the answer to cross question 1 is anything but an unqualified "no," then for each such conversation:
(a) state when the conversation occurred;
(b) identify all persons who spoke during the conversation;
(c) identify all other persons who were present during the conversation; and
(d) state to the best of your recollection what each speaker said during the conversation.
3. Did you, in 1980 or 1981, have any conversation with anyone other than a Continental employee or other representative in which Continental's financial condition or proposed sale, or rumors or statements concerning either of these subjects, were discussed.
4. If the answer to cross question 3 is anything but an unqualified "no," then for each such conversation:
(a) state when the conversation occurred;
(b) identify all persons who spoke during the conversation;
(c) identify all other persons who were present during the conversation; and
(d) state to the best of your recollection what each speaker said during the conversation.
5. If the answer to direct question 6 is an unqualified "no", did you engage in any conversation with Bonnie J. Kuper on or about January 5, 1981?
6. If the answer to cross question 5 is anything but an unqualified "no":
(a) identify all persons (other than Ms. Kuper and yourself) who were present during the conversation; and
(b) state to the best of your recollection what each speaker said during the conversation.
7. If the answer to direct question 9(a) or (b) is an unqualified "no", did you engage in any conversation with Nathan B. Kaufman, William E. Clancy and/or William T. Schleyer on or about January 5, 1981?
8. If the answer to cross question 7 is anything but an unqualified "no":
(a) identify the person or persons from among Messrs. Kaufman, Clancy and Schleyer with whom you engaged in the conversation;
(b) identify all persons (other than those identified in response to cross question 8(a) and yourself) who were present during the conversation; and
(c) state to the best of your recollection what each speaker said during the conversation.
9. If the answer to direct question 12(a), (b), (c), (d), (e) or (f) is an unqualified "no", did you engage in any conversation with William T. Schleyer on or about January 5, 1981?
10. If the answer to cross question 9 is anything but an unqualified "no":

*446 (a) identify all persons (other than Mr. Schleyer and yourself) who were present during the conversation; and
(b) state to the best of your recollection what each speaker said during the conversation.
11. If the answer to direct question 6 is anything but an unqualified "no", please state all facts on which you based the described statement to Ms. Kuper.
12. If the answer to direct question 9(a) is anything but an unqualified "no", please identify the "higher ups" or "higher officials" to whom your described statement referred.
13. If the answer to direct question 9(b) is anything but an unqualified "no", please state all facts on which you based the described statement to Mr. Kaufman, Mr. Clancy and/or Mr. Schleyer.
14. If the answer to direct question 12(b) is anything but an unqualified "no", please state all facts on which you based the described statement to Mr. Schleyer.
15. If the answer to direct question 12(c) is anything but an unqualified "no", please state all facts on which your described statement to Mr. Schleyer was based.
16. If the answer to direct question 12(d) is anything but an unqualified "no", please identify, if you can, the described literature to which your statement referred.
17. If the answer to direct question 12(e) is anything but an unqualified "no", please state all facts on which you based the described statement to Mr. Schleyer.
18. If the answer to direct question 12(f) is anything but an unqualified "no", please state all facts on which you based the described statement to Mr. Schleyer.
19. If you decline to answer any of these cross questions on the ground of privilege, please state as to each affected answer:
(a) the basis for the claim of privilege;
(b) the basis for your belief that you had an understanding or agreement of confidentiality or non-disclosure for the information sought; and
(c) whether the information sought was ever disclosed to any third party and, if so, when and to whom.
CONTINENTAL CABLEVISION, INC.
By its attorneys,
______________________________
Edward R. Lev
Ira K. Gross
 SULLIVAN & WORCESTER
 One Post Office Square
 Boston, Massachusetts 02109
 617/337-2800
May 31, 1983