Judy GARLAND, Petitioner-Appellee,

v.

Marie TORRE, Respondent-Appellant.

No. 325, Docket 24951.

United States Court of Appeals Second Circuit.

Argued May 2, 1958.

Decided Sept. 30, 1958.

Certiorari Denied Dec. 8, 1958.

See 79 S.Ct. 237.

Lionel S. Popkin (of Hess, Mela, Segall, Popkin & Guterman), New York City (Lee N. Steiner, New York City, of counsel), for petitioner-appellee.

Mathias F. Correa (of Cahill, Gordon, Reindel & Ohl), New York City (Sheldon

Oliensis, New York City, of counsel), for respondent-appellant.

Before CLARK, Chief Judge, and HINCKS and STEWART, Circuit Judges.

STEWART, Circuit Judge.

Judy Garland brought an action against Columbia Broadcasting System, Inc. (CBS), in the district court. Her complaint set out two claims, one for breach of contract, the other alleging that the defendant had made false and defamatory statements about her and had "authorized, requested and induced" their publication in newspapers and elsewhere. An alleged example of such a publication, annexed as an exhibit to the complaint, consisted of a few paragraphs in a column entitled "TV-Radio Today," written by Marie Torre, and published in the New York Herald Tribune on January 10, 1957. In this column Miss Torre attributed to a CBS "network executive" several statements about the plaintiff which, the complaint alleged, were false, defamatory, and highly damaging to the plaintiff's professional reputation. CBS filed an answer and counterclaim, denying among other things that it had made the alleged false and defamatory statements or caused them to be published.

With the issue thus joined, counsel for both parties embarked upon pre-trial discovery proceedings. In a deposition taken by the defendant's counsel, the plaintiff testified that she did not know who at CBS had made the statements appearing in the Torre column, but that she had "been told it was either Lester Gottlieb or Hubbell Robinson." Gottlieb and Robinson were both executives of CBS. In their depositions, taken by the plaintiff's counsel, each denied making the statements in question. Each also denied knowing the identity of the "network executive" referred to in the column.[1]

The plaintiff's counsel then took Marie Torre's deposition. She testified that the statements appearing in the column were in "exact words" statements which had been made to her over the telephone by a CBS informant. She refused, under repeated questioning, to give the name of this "network executive," asserting that to do so would violate a confidence. Proceedings were then initiated in the district court to compel her to disclose the name. Her counsel countered by filing a motion for an order directing that the identity of the CBS informant "not be inquired into" upon the ground that examination upon this subject would "unreasonably annoy, embarrass and oppress" the deponent. F.R. Civ.P. Rule 30, 28 U.S.C.A. After a hearing the district court denied the latter motion and ordered the witness to state the name of her informant. Upon her refusal in the presence of the court to do so, she was held in criminal contempt, and this appeal followed.[2]

Three alternative arguments are advanced in support of the appellant's position that it was error to require her to disclose in these pre-trial proceedings the identity of a confidential news source.[3] The first contention is a Constitutional one—to compel newspaper reporters to disclose confidential sources of news would, it is asserted, encroach upon the freedom of the press guaranteed by the First Amendment, because "it would impose an important practical re-

---

1. A third CBS executive, whose deposition was taken later, testified similarly.

2. Sentenced to ten days imprisonment, the appellant was promptly released upon her own recognizance pending determination of the appeal. The district judge expressly noted on the record that the appellant was entirely respectful to the court and intended no personal affront to its dignity.

3. This confidentiality was apparently not explicit: "Q. Did this network executive ask you to withhold giving his name? A. No, he did not. It is just that having worked in the business so long, in cases like this you don't mention the man's name."

straint on the flow of news from news sources to news media and would thus diminish *pro tanto* the flow of news to the public." Secondly, it is urged that quite apart from any Constitutional question, the societal interest in assuring a free and unrestricted flow of news to the public should impel this court to hold that the identity of a confidential news source is protected by at least a qualified privilege. Finally, the appellant contends that in the particular circumstances of this case the district court in any event should have ordered, under F.R.Civ.P. Rule 30, that no inquiry be made as to the identity of the CBS spokesman.

■ As to the Constitutional issue, we accept at the outset the hypothesis that compulsory disclosure of a journalist's confidential sources of information may entail an abridgment of press freedom by imposing some limitation upon the availability of news.[4] Freedom of the press within the historic meaning of the First Amendment meant primarily freedom from previous restraints upon publication and freedom from censorship. Near v. State of Minnesota, 1931, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357. Yet in the domain of indispensable First Amendment liberties, it is essential "not to limit the protection of the right to any particular way of abridging it." Grosjean v. American Press Co., 1936, 297 U.S. 233, 249, 56 S.Ct. 444, 449, 80 L.Ed. 660. The fact that no direct restraint is imposed does not determine the question. American Communications Ass'n, C. I. O. v. Douds, 1950, 339 U.S. 382, 402, 70 S.Ct. 674, 94 L.Ed. 925. "[A]bridgment of such rights, even

though unintended, may inevitably follow from varied forms of governmental action." National Ass'n for Advancement of Colored People v. State of Alabama ex rel. Patterson, 1958, 357 U.S. 449, 461, 78 S.Ct. 1163, 1171, 2 L.Ed. 2d 1488.

■ But freedom of the press, precious and vital though it is to a free society, is not an absolute. What must be determined is whether the interest to be served by compelling the testimony of the witness in the present case justifies some impairment of this First Amendment freedom. That kind of determination often presents a "delicate and difficult" task. Schneider v. State of New Jersey, 1939, 308 U.S. 147, 161, 60 S.Ct. 146, 161, 84 L.Ed. 155; American Communications Ass'n, C. I. O. v. Douds, supra, 339 U.S. at page 400, 70 S.Ct. at page 684 (and see cases cited in that opinion at pages 398 and 399, at pages 683 and 684 respectively). The task in the present case, though perhaps delicate, does not seem difficult.

"Liberty, in each of its phases, has its history and connotation." Near v. State of Minnesota, supra, 283 U.S. at page 708, 51 S.Ct. at page 628. Freedom of the press, hard-won over the centuries by men of courage, is basic to a free society. But basic too are courts of justice, armed with the power to discover truth. The concept that it is the duty of a witness to testify in a court of law has roots fully as deep in our history as does the guarantee of a free press.

It would be a needless exercise in pedantry to review here the historic development of that duty.[5] Suffice it to

4. Insofar as this proposition is factually supported in the record by the affidavits of Ogden R. Reid and Marie Torre, it is of course more than just a hypothesis. To be noted, however, are decisions to the effect that a journalist's professional status does not entitle him to sources of news inaccessible to others. United Press Associations v. Valente, 1954, 308 N.Y. 71, 123 N.E.2d 777; Tribune Review Pub. Co. v. Thomas, 3 Cir., 1958, 254 F.2d 883.

5. The history of the development of testimonial compulsion in English law is summarized in 8 Wigmore, Evidence, §§ 2190–2191 (3d ed. 1940). It was only after years of creative evolution that Sir Francis Bacon was able in 1612 to say in the Countess of Shrewsbury's Trial, 2 Howell's State Trials 769, 778: " * * * you must know that all subjects, without distinction of degrees, owe to the king tribute and service, not only of their deed and hand, but of their knowledge and

state that at the foundation of the Republic the obligation of a witness to testify and the correlative right of a litigant to enlist judicial compulsion of testimony were recognized as incidents of the judicial power of the United States. Blair v. United States, 1919, 250 U.S. 273, 279–281, 39 S.Ct. 468, 63 L.Ed. 979; Wilson v. United States, 1911, 221 U.S. 361, 372–373, 31 S.Ct. 538, 55 L.Ed. 771; Blackmer v. United States, 1932, 284 U.S. 421, 438, 52 S.Ct. 252, 76 L.Ed. 375; United States v. Bryan, 1950, 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884. Whether or not the freedom to invoke this judicial power be considered an element of Fifth Amendment due process, its essentiality to the fabric of our society is beyond controversy.[6] As Chief Justice Hughes put it: "[O]ne of the duties which the citizen owes to his government is to support the administration of justice by attending its courts and giving his testimony whenever he is properly summoned." Blackmer v. United States, supra, 284 U.S. at page 438, 52 S.Ct. at page 255.

Without question, the exaction of this duty impinges sometimes, if not always, upon the First Amendment freedoms of the witness. Material sacrifice and the invasion of personal privacy are implicit in its performance. The freedom to choose whether to speak or be silent disappears. But "[t]he personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public." Blair v. United States, supra, 250 U.S. at page 281, 39 S.Ct. at page 471.

If an additional First Amendment liberty—the freedom of the press—is here involved, we do not hesitate to conclude that it too must give place under the Constitution to a paramount public interest in the fair administration of justice. "The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government." Chambers v. Baltimore & Ohio R. Co., 1907, 207 U.S. 142, 148, 28 S.Ct. 34, 38, 52 L.Ed. 143. This, as Mr. Justice Frankfurter has pointed out in a somewhat different context, "has nothing to do with curtailing expression of opinion, be it political, economic, or religious, that may be offensive to orthodox views. It has to do with the power of the state to discharge an indispensable function of civilized society, that of adjudicating controversies between its citizens and between citizens and the state through legal tribunals in accordance with their historic procedures." Bridges v. State of California, 1941, 314 U.S. 252, 291, 62 S.Ct. 190, 207, 86 L.Ed. 192 (dissenting opinion). See Patterson v. Colorado ex rel. Attorney General, 1907, 205 U.S. 454, 462–463, 27 S.Ct. 556, 51 L.Ed. 879.[7]

It is to be noted that we are not dealing here with the use of the judicial process to force a wholesale disclosure of a newspaper's confidential sources of news, nor with a case where the identity of the news source is of doubtful relevance

---

discovery. If there be anything that imports the king's service, they ought themselves undemanded to impart it; much more if they be called and examined, whether it be of their own fact or of another's they ought to make direct answer." 8 Wigmore, Evidence, § 2190. By the early Eighteenth Century it had become a "maxim" that "the public has a right to every man's evidence." 8 id., § 2192.

**6.** It has been pointed out that the Sixth Amendment, expressly securing to criminal defendants the right to compulsory process for their witnesses, "provided nothing new or exceptional; but gave

solid sanction, in the special case of accused persons, to the procedure ordinarily practised and recognized for witnesses in general." 8 id., § 2191.

**7.** Compare Bridges v. State of California, 1941, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346; Pennekamp v. State of Florida, 1946, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295; Craig v. Harney, 1947, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546. These decisions all recognized that when the exercise of freedom of the press directly impedes the proper functioning of the judicial process, it must yield.

or materiality. Cf. National Ass'n for Advancement of Colored People v. State of Alabama ex rel. Patterson, 1958, 357 U.S. 449, 464–465, 78 S.Ct. 1163, 2 L.Ed. 2d 1488. The question asked of the appellant went to the heart of the plaintiff's claim. We hold that the Constitution conferred no right to refuse an answer.

■ But even though lacking Constitutional sanction, the appellant's refusal to disclose the name of her informant should, it is asserted, be protected by an evidentiary privilege. A threshold question—whether the existence of such a privilege is to be determined in this diversity case solely by New York law—is one unnecessary to decide.[8] If New York law controls, there is no privilege. People ex rel. Mooney v. Sheriff of New York County, 1936, 269 N.Y. 291, 199 N.E. 415, 102 A.L.R. 769. If we are free to look beyond the law of New York, we find no reason to depart from the precedents, federal and state, refusing to recognize such a privilege in the absence of a statute creating one. Brewster v. Boston-Herald-Traveler Corp., D.C.D. Mass.1957, 20 F.R.D. 416; Rosenberg v. Carroll, D.C.S.D.N.Y.1951, 99 F.Supp. 629; Clein v. State, Fla.1950, 52 So.2d 117; Plunkett v. Hamilton, 1911, 136 Ga. 72, 70 S.E. 781, 35 L.R.A.,N.S., 583.

The privilege not to disclose relevant evidence obviously constitutes an extraordinary exception to the general duty to testify. Even those few situations to which the law has long accorded this privilege have been seriously questioned.[9] It has been emphasized that the tendency should be "not to extend the classes to whom the privilege from disclosure is granted, but to restrict that privilege." People v. Sheriff of New York County, supra, 269 N.Y. at page 295, 199 N.E. at page 416.[10] To recognize the privilege asserted here, assuming our power to do so, would poorly serve the cause of justice.

■■ There remains the appellant's argument that in the circumstances of this case the district judge should have ordered, under Rule 30, F.R.Civ.P., that no inquiry be made of her as to the identity of her CBS informant.[11] The appellant points to the injury to her position as a journalist that could result from her compulsion to testify and to the possibility that the plaintiff might be able to acquire the information somewhere else. She also argues that the plaintiff's claim for defamation is "of problematical merit, with grave doubt of ever being brought to trial," and that the information sought to be exacted will therefore probably prove of no actual use to the plaintiff.

The language of Rule 30 clearly places the making of protective orders within the discretion of the trial court. There

8. Compare Engl v. Aetna Life Ins. Co., 2 Cir., 1943, 139 F.2d 469, 470; Palmer v. Fisher, 7 Cir., 1955, 228 F.2d 603, 607–608; Munzer v. Swedish American Line, D.C.S.D.N.Y.1940, 35 F.Supp. 493, 496; Reeves v. Pennsylvania R. Co., D.C.D.Del. 1949, 8 F.R.D. 616 with Scourtes v. Fred W. Albrecht Grocery Co., D.C.N.D.Ohio 1953, 15 F.R.D. 55, 57; Ex parte Sparrow, D.C.N.D.Ala.1953, 14 F.R.D. 351. Cf. Hickman v. Taylor, 1957, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451. See 4 Moore, Federal Practice, § 26.23 [9]; Greene, The Admissibility of Evidence under the Federal Rules, 55 Harv.L.R. 197 (1941).

9. See, e. g., Morgan, "Foreword," Model Code of Evidence (1942), pp. 22–30.

10. See, e. g., 8 Wigmore, Evidence, §§ 2192, 2286 (3d ed., 1942); Ladd, "A Modern Code of Evidence," Model Code of Evidence (1942), p. 346. An extension of the privilege of nondisclosure to newspapermen has been the subject of considerable specific study and criticism. See New York Law Revision Commission, Report (1949), pp. 23–168, for a comprehensive treatment of the subject in all its aspects; see excerpts from 1930 bulletins of the Committee on State Legislation, Assn. of the Bar of the City of N. Y., and from 1938 report of the A. B. A. Committee on the Improvement of the Law of Evidence quoted in 8 Wigmore, Evidence, § 2286 (3d ed., 1942).

11. The appeal from the contempt order opens the preliminary proceedings to review. Hickman v. Taylor, 3 Cir., 1945, 153 F.2d 212, affirmed 1947, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451.

was no abuse of that discretion in this case. In denying the motion, Judge Ryan found that the deposition was "being taken by plaintiff in good faith and not in such manner as to unreasonably annoy, embarrass or oppress the witness," and further that it was "a necessary step in the due and proper preparation for trial."

These findings were entirely justified. While it is possible that the plaintiff could have learned the identity of the informant by further discovery proceedings directed to CBS, her reasonable efforts in that direction had met with singular lack of success. Without intimating the slightest view as to the merits of Judy Garland's claim against CBS for defamation, we cannot say that the claim is patently frivolous. The information sought was of obvious materiality and relevance. That being so, the eventual outcome of the litigation is not for the appellant nor for this court now to prophesy. Cf. Blair v. United States, 1919, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979.

Affirmed.