**Murray W. (Dusty) MILLER, Plaintiff-Appellee,**

v.

**TRANSAMERICAN PRESS, INC., Transamerican Press of Texas, Inc. and Mike Parkhurst, Defendants-Appellants.**

No. 78–1206.

United States Court of Appeals, Fifth Circuit.

July 15, 1980.

Rehearing and Motion to Vacate Orders Denied Sept. 3, 1980.

James M. Schendle, Charles L. Babcock, Dallas, Tex., for defendants-appellants.

George K. Rahdert, Tampa, Fla., Richard M. Schmidt, Jr., Washington D.C., amicus curiae, for The American Society of Newspaper Editors, et al.

Otto B. Mullinax, Dallas, Tex., for plaintiff-appellee.

Before COLEMAN, Chief Judge, FRANK M. JOHNSON, Jr. and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

In this 28 U.S.C. § 1292(b) interlocutory appeal, we decided whether the plaintiff in a libel suit can compel discovery of the identity of a confidential source of the journalist defendants. We conclude that he can.

Murray W. (Dusty) Miller, Secretary-Treasurer of the International Brotherhood of Teamsters, sued Transamerican Press and Mike Parkhurst for libel. Transamerican Press, a California corporation, published *Overdrive*, a magazine which had national distribution to truckers.[1] Parkhurst, a California citizen, was editor and publisher. For convenience, we refer to both defendants as Transamerican. Miller is a Virginia domiciliary who works in Washington, D.C.[2]

---

1. Transamerican Press has filed for bankruptcy and *Overdrive* is no longer published.

2. We proceed on this assumption for purposes of this opinion only. At oral argument, Miller's

In its June, 1972, issue, *Overdrive* published a nine page article entitled "Central States Pension Fund—How Your Sweat Finances Crooks' Cadillacs." One passage in the article alleged that Miller swindled the pension fund out of $1.6 million through a fraudulent loan:

> The money doesn't all go to the employer segment of trucking. Take Murray (Dusty) Miller, 4th Vice-President of the International and Director of the Southern Conference. Dusty was a trustee of the Fund from its formation in 1955 until 1968. Before he left, Dusty borrowed $1.6 million in 1965 from the Fund to buy Trinity Sand & Gravel in Dallas. Almost immediately, the Fund foreclosed on the company without a single penny having been paid on the loan. Almost as instantly, a new corporation was formed which borrowed another $1.4 million from the Fund. This corporation—Metropolitan Sand & Gravel—was set up by St. Louis attorney Morris Shenker, and his ownership in it is 45%. Shenker is probably right behind Dorfman when it comes to having influence over the Fund. Shenker, though, specializes in dealing with the Mafia, a subject to be covered thoroughly in our next article. The 2,800 acres of land now controlled by Shenker, it appears, now is valued at $300 million, thanks to a federal decision to build a multi-billion dollar barge channel through it from Dallas-Fort Worth to the Gulf of Mexico. This good fortune doesn't seem to have affected the company's payments to the Fund: $1.1 million loan (This does not include the $1.6 million. That is gone. Just ask Dusty.)

Miller had been a trustee of the Central States Pension Fund from 1955 to 1968. He was Fourth Vice President of the International and Director of the Southern Conference from 1957 to 1972, and held that office at the time of publication. At the

time of publication, he lived and worked full time in Texas. When he filed this suit he was a Virginia domiciliary.

Discovery began, and Miller learned from Parkhurst and James Drinkhall, the author of the article, that the source of the passage was a confidential informant. Miller filed three motions to compel disclosure of the identity of the informant. Each was denied by the district court, which found that Miller had not exhausted alternative means of proving that Transamerican was reckless.

Miller submitted an affidavit swearing that the charges were false. Transamerican claimed that Morris Shenker, a trustee of the pension fund and an ultimate purchaser of Trinity's land, would be in a position to say whether Miller had pocketed any of the $1.6 million in loans to Trinity. Miller then submitted written interrogatories to Shenker, who answered that, to his knowledge, Miller had never borrowed any money from the Central States Pension Fund.

On April 22, 1975, after an *in camera* examination, the district judge ordered the defendants to produce summaries of non-privileged parts of the file used in preparation of the article. The order provided that the summaries were for the use of Miller's counsel only, and were strictly for use in the litigation. In addition to the summaries, some non-privileged documents were released to Miller's counsel.

On April 21, 1977, Miller moved for the fourth time for disclosure of the identity of the informant. In his memorandum and order of October 17, 1977, the district judge ordered disclosure, concluding that the informant's identity went to the heart of the matter. At the request of Transamerican, the judge certified the order for an interlocutory appeal under 28 U.S.C. § 1292(b).

### I. Is Miller a public figure?

The district court assumed that Miller was a public figure in its order of

---

counsel said that although Miller is formally a Virginia domiciliary and formally has his principal place of business in Washington, D.C., in reality he lives and conducts most of his business in Texas. Transamerican's counsel disputed this, contending that there was nothing in the record to show it. We express no opinion on this dispute, which the trial court may have to resolve at a later stage of this case.

July 25, 1974. However, in its order of October 17, 1977, it clearly stated that it had as yet made no ruling on this issue. In a defamation case, the question of public figure status is pervasive, and it should be answered as soon as possible. In some cases it may not be possible to resolve the issue until trial, but this is not such a case. Miller, a high-ranking official of a union of tremendous importance to our economy, as relates to his official duties is a public figure. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Because Miller is a public figure he must prove Transamerican acted with malice when it published the article. As we noted in our recent decision of *Long v. Arcell*, 618 F.2d 1145, 1147 (5th Cir. 1980), involving public figure plaintiffs:

> In order for the plaintiffs to recover damages, therefore, they were required to prove by clear and convincing evidence that the defendants acted with actual malice as defined in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny. *See Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967). A publisher acts with actual malice when he prints a story with knowledge that it is false or with reckless disregard for the truth. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789, 806 (1974); *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968).

## II. Which state's law governs?

Transamerican argues that the law of California, the state where the editorial work was done and the home state of Transamerican and Parkhurst, governs the existence of a reporter's privilege.

■ Under Fed.R.Evid. 501, the availability of a privilege in a diversity case is governed by the law of the forum state. The question of which law Texas, the forum state, would apply is difficult. *See* Reese and Leiwant, *Testimonial Privileges and Conflict of Laws*, 86 Law and Contemp. Problems 85 (1977); Sterk, *Testimonial Privileges: An Analysis of Horizontal Choice of Law Problems*, 61 Minn.L.Rev. 461 (1977).

We do not have to resolve this issue since all jurisdictions whose law might be applicable follow the same rule. Texas has no reporter's privilege statute, and the Texas Supreme Court has not considered the issue. Two decisions have limited a reporter's privilege of non-disclosure of confidential sources to what is required by the First Amendment. *Dallas Oil & Gas v. Mouer*, 533 S.W.2d 70 (Tex.Civ.App. Dallas, 1976); *Adams v. Associated Press*, 46 F.R.D. 439 (S.D.Tex.1969). Virginia has no reporter's privilege statute, and the Virginia Supreme Court has tailored the privilege to the limits protected by the First Amendment. *Brown v. Commonwealth*, 214 Va. 755, 204 S.E.2d 429 (1976), *cert. denied*, 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182. The Court of Appeals for the D.C. Circuit has done the same in the District of Columbia. *Carey v. Hume*, 492 F.2d 631 (D.C. Cir. 1974), *appeal dismissed*, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661. That leaves California.

At first glance, California Evidence Code § 1070(a) (1979 Supp.) arguably bars disclosure of the informant's identity.[3] A parsing of the language and a review of the legislative history, however, compel a dif-

---

3. § 1070. Newsmen's refusal to disclose news source

(a) A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, cannot be adjudged in contempt by a judicial, legislative, administrative body, or any other body having the power to issue subpoenas, for refusing to disclose, in any proceeding as defined in Section 901, the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

ferent interpretation.[4] The California legislature did not create a reporter's privilege broader than the First Amendment. It only prohibited the use of contempt citations against newsmen refusing to disclose their sources.

Thus each jurisdiction with an interest in having its law applied limits the reporter's privilege to the protections afforded by the First Amendment.

III. Do the defendants have a First Amendment privilege against disclosure?

This case is controlled by *Butts, supra; Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); and *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). We hold that a reporter has a First Amendment privilege which protects the refusal to disclose the identity of confidential informants, however, the privilege is not absolute and in a libel case as is here presented, the privilege must yield. As the Supreme Court observed in *Herbert v. Lando* : "Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances." (99 S.Ct. at 1648).

Four other circuits have considered this issue. *Carey v. Hume, supra; Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); *Garland v. Torre,* 259 F.2d 545 (2d Cir. 1958), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231. *See also Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433 (10th Cir. 1977) (tort case; conspiracy to violate constitutional rights). However, we are the first to consider it since *Herbert v. Lando.*

*Butts* held that a public figure could recover for defamation only if the defendant acted recklessly or with knowing falsehood. *Branzburg* held that in grand jury proceedings, reporters must disclose the names of confidential informants except where the grand jury power was abused. *Herbert* held that the press had no First Amendment privilege against discovery of mental processes where the discovery was for the purpose of determining whether malice existed.

The policies supporting a First Amendment privilege would appear to be stronger here, where a defamation plaintiff seeks to compel disclosure of the name of a confidential informant, than they were in either *Branzburg* or *Herbert.* In *Herbert,* the Supreme Court reasoned that requiring disclosure of journalists' thought processes would have no chilling effect on the editorial process; the only effect would be to deter recklessness. However, forced disclosure of journalists' sources might deter informants from giving their stories to newsmen, except anonymously. This might cause the press to face the unwelcome alternatives of not publishing because of the inherent unreliability of anonymous tips, or publishing anonymous tips and becoming vulnerable to charges of recklessness.

Similarly, there is a more apparent interest in protecting the confidentiality of journalists' sources in libel cases than in grand jury proceedings. In *Branzburg,* the prosecutor had an interest in keeping the informant's identity secret in order to protect him from reprisal. The government and the press had a similar purpose, both were ferreting out wrongdoing and seeking to correct it. In a libel case, the plaintiff and the press are on opposite sides. And a defamed plaintiff might relish an opportunity to retaliate against the informant.

*Butts* tells us that there is a First Amendment policy of free investigation of public figures because their activities are

---

4. The California Assembly Committee on the Judiciary noted:

. . . It should be noted that Section 1070, like the existing law, provides an immunity from being adjudged in contempt; *it does not create a privilege.* Thus, the section will not prevent the use of other sanctions for refusal of a newsman to make discovery when he is a party to a civil proceeding. (Emphasis added.)

Assembly Committee on Judiciary, *Comment on Cal.Evid.Code § 1070, reprinted at* Cal.Evid. Code § 1070 (West, 1968).

matters of public concern. 388 U.S. 130, 164, 87 S.Ct. 1975, 1996 (Warren, C.J., concurring); *cf.* Hill, *Defamation and Privacy Under the First Amendment*, 76 Col.L.Rev. 1205, 1214–19. The First Amendment interest in granting a privilege is particularly strong when the article concerns a public figure.

A final First Amendment consideration, in a case involving a public figure, is that it will often be possible to establish malice or lack of malice without disclosure of the identity of the informant. A plaintiff may be able to find other evidence of malice, or a defendant may be able to come forward with sufficient evidence of prudence in printing which would carry the burden in support of a motion for summary judgment.

The other circuits have followed a three part test first outlined in *Garland* : (1) is the information relevant, (2) can the information be obtained by alternative means, and (3) is there a compelling interest in the information?

In the case before us the information is relevant. The district court found that the alternative means had been exhausted, and this finding is not clearly erroneous. Fed. R.Civ.P. 52. That leaves the third prong, compelling interest.

In *Cervantes*, the Eighth Circuit found no compelling interest when the mayor of St. Louis complained of four paragraphs in an 87 paragraph story. There was ample evidence showing that a thorough investigation preceded publication.[5] The court said:

> [I]f, in the course of pretrial discovery, an allegedly libeled plaintiff uncovers substantial evidence tending to show that the defendant's published assertions are so inherently improbable that there are strong reasons to doubt the veracity of the defense informant or the accuracy of his reports, the reasons favoring compulsory disclosure . . . become more compelling. Similarly, where pretrial discovery produces some factor which would support the conclusion that the defendant in fact entertained serious doubt as to the truth of the matters published, identification and examination of defense news sources seemingly would be in order, and traditional summary judgment doctrine would command pursuit of further discovery prior to adjudication of a summary judgment motion . . .

464 F.2d at 994.

In *Carey*, the D.C. Circuit found a compelling interest in disclosure. The record did not disclose a thorough investigative effort by the defendant. The plaintiff, a high official of the United Mine Workers, was accused of thwarting a government investigation by removing boxes of incriminating documents from his office at night over an indefinite period of weeks. The only evidence within the plaintiff's control that could disprove the story was his own testimony. Since the story was based solely on information from a confidential informant, the only way to determine recklessness was to examine the reliability of the informant.

*Garland* was similar to *Carey*. Judy Garland claimed she was defamed in a newspaper article that quoted an unnamed CBS executive. She sued CBS and deposed the two executives who supposedly had made the defamatory statement. Both denied having made it. Garland subpoenaed the reporter to determine the source of her information. The reporter's claim of privilege was overriden. The information was obviously relevant and there was no other proof reasonably available to Miss Garland.

Miller's case is more akin to *Garland* and *Carey* than it is to *Cervantes*. Unlike the mayor in *Cervantes*, Miller challenges every statement that refers to him and that could be interpreted as defamatory. Like the defendants in *Carey* and *Garland*, Transamerican's only source for the allegedly libelous comments is the informant. The only way that Miller can establish malice and prove his case is to show that Transamerican knew the story was false or that it was reckless to rely on the informant. In

5. The mayor complained that he had been defamed in an article entitled "The Mayor, The Mob and The Lawyer." The lawyer was Morris Shenker.

order to do that, he must know the informant's identity.

We affirm the district court's order compelling disclosure of the informant's identity. On remand, the district court should protect the informant by restricting the information about the informant's identity to counsel and requiring that it be used strictly for the litigation. The district judge observed in his April 22, 1975 order that the material in the back-up file tended to undercut a showing of recklessness. After disclosure, further summary proceedings may be appropriate.

The decision of the district court is AFFIRMED and the matter is returned to the district court.