696 So.2d 399 (1997)
David KIDWELL, Appellant,
v.
STATE of Florida, Appellee.
No. 96-3423.
District Court of Appeal of Florida, Fourth District.
June 11, 1997.
Rehearing and Clarification Denied July 14, 1997.
*400 Sanford L. Bohrer of Holland & Knight, Miami, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Don M. Rogers, Assistant Attorney General, West Palm Beach, for appellee.
Robert Rivas and Florence Snyder Rivas of Rivas & Rivas, Boca Raton, and Jane E. Kirtley, Gregg P. Leslie and Tina Burnside, Arlington, VA, for amicus curiae, The Reporters Committee for Freedom of the Press, Arlington, Virginia.
FARMER, Judge.
At bottom, the issue raised in this contempt proceeding is identical to that decided by this court in Gold Coast Publications Inc. v. State, 669 So.2d 316 (Fla. 4th DCA 1996). We, of course, follow our recent precedent, which means that we affirm the judgment of contempt.
Here a newspaper reporter engaged in a jailhouse interview with a man charged with murder. The defendant had previously given the police a confession. The interview was not on any confidential basis, and the reporter made no promises to defendant of any confidentiality in order to persuade him to talk to the reporter. In a later newspaper article, the reporter wrote extensively about the interview.
After a mistrial was ordered in the criminal case, necessitating a retrial,[1] the prosecutor subpoenaed the reporter for a deposition for discovery purposes and to adduce at the retrial certain statements made by the defendant to the reporter. The prosecutor openly revealed his intention to use these statements as admissions of the defendant at the retrial. The reporter, however, claimed a privilege on the grounds that his knowledge was acquired while he was engaged in "professional news gathering." After being ordered by the trial judge to answer the prosecutor's questions, the reporter continued to claim the privilege and refused to answer. The trial judge found him in criminal contempt and sentenced him to be incarcerated for 70 days in jail or until he earlier answered the questions, and to pay a fine of $500. This appeal timely followed.
The retrial has since been had and the defendant convicted but without any testimony from the reporter. We must therefore first address why this case is no longer moot. The trial judge has refused to vacate the contempt conviction on account of that circumstance. In doing so, the trial judge has obviously concluded that the contempt conviction is necessary to vindicate the powers of the court in providing access to relevant evidence, and we do not fault him in that determination. The criminal justice system would founder at the very beginning of the process if witnesses with relevant and unprivileged knowledge could decide when they shall be required to testify and the subjects about which they can permissibly be examined. Our system has long recognized the right of both the state and the defendant *401 to "every man's evidence"[2] and has provided compulsory process for the attendance and testimony of witnesses. The process for summoning witnesses would soon lack any compulsion if witnesses could refuse compliance with subpoenas issued to procure their testimony.
The reporter argues that he has a First Amendment privilege to refuse to testify about his communications with the criminal defendant even though his conversations were undertaken without any promise of confidentiality. In short, he argues that a reportorial privilege exists for nonconfidential sources when they are acquired in "professional news gathering activities." This argument is directly contrary to our recent holding in Gold Coast Publications. Just as we did there, we rely on Miami Herald Pub. Co. v. Morejon, 561 So.2d 577 (Fla.1990), where the court made clear:
"[T]here is no privilege, qualified, limited, or otherwise, which protects journalists from testifying as to their eyewitness observations of a relevant event in a subsequent court proceeding. The fact that the reporter in this case witnessed the event while on a news gathering mission does not alter our decision.... Unlike the factual situations in Branzburg [v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)], Morgan [v. State, 337 So.2d 951 (Fla.1976)], and [Tribune Co. v.] Huffstetler, [489 So.2d 722 (Fla.1986)], there is no confidential source involved in this case which may `dry up' if revealed."
561 So.2d at 580-81.
In Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Court confronted a claim of privilege by media reporters after they had been served with subpoenas ad testificandum to appear before a Grand Jury and testify about criminal events they had witnessed while engaged in news gathering. The argument made by these reporters was simply stated as follows:
"that to gather news it is often necessary to agree either not to identify the source of information published or to publish only part of the facts revealed, or both; that if the reporter is nevertheless forced to reveal these confidences to a grand jury, the source so identified and other confidential sources of other reporters will be measurably deterred from furnishing publishable information, all to the detriment of the free flow of information protected by the First Amendment. Although the newsmen in these cases do not claim an absolute privilege against official interrogation in all circumstances, they assert that the reporter should not be forced either to appear or to testify before a grand jury or at trial until and unless sufficient grounds are shown for believing that the reporter possesses information relevant to a crime the grand jury is investigating, that the information the reporter has is unavailable from other sources, and that the need for the information is sufficiently compelling to override the claimed invasion of First Amendment interests occasioned by the disclosure."
408 U.S. at 679-680, 92 S.Ct. at 2655-2656. The Court then framed the issue as follows:
"The sole issue before us is the obligation of reporters to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime. Citizens generally are not constitutionally immune from grand jury subpoenas; and neither the First Amendment nor any other constitutional provision protects the average citizen from disclosing to a grand jury information that he has received in confidence. The claim is, however, that reporters are exempt from these obligations because if forced to respond to subpoenas and identify their sources or disclose other confidences, their informants will refuse or be reluctant to furnish newsworthy information in the future. This asserted burden on news gathering is said to make compelled testimony from newsmen constitutionally suspect and to require a privileged position for them." *402 408 U.S. at 682, 92 S.Ct. at 2657. It will, of course, be seen that the claim of the newsmen in Branzburg involved confidential sources rather than, as here, ordinary nonconfidential sources of information.
Proceeding from that statement of the contentions of the newsmen, the court reasoned that:
"It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability. Under prior cases, otherwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden that may be imposed. The Court has emphasized that `(t)he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.' Associated Press v. NLRB, 301 U.S. 103, 132-133, 57 S.Ct. 650, 656, 81 L.Ed. 953 (1937). It was there held that the Associated Press, a news-gathering and disseminating organization, was not exempt from the requirements of the National Labor Relations Act. The holding was reaffirmed in Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 192-193, 66 S.Ct. 494, 497-498, 90 L.Ed. 614 (1946), where the Court rejected the claim that applying the Fair Labor Standards Act to a newspaper publishing business would abridge the freedom of press guaranteed by the First Amendment.... Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), similarly overruled assertions that the First Amendment precluded application of the Sherman Act to a newsgathering and disseminating organization.... Likewise, a newspaper may be subjected to nondiscriminatory forms of general taxation ... The prevailing view is that the press is not free to publish with impunity everything and anything it desires to publish. Although it may deter or regulate what is said or published, the press may not circulate knowing or reckless falsehoods damaging to private reputation without subjecting itself to liability for damages, including punitive damages, or even criminal prosecution.... A newspaper or a journalist may also be punished for contempt of court, in appropriate circumstances....
"It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. Zemel v. Rusk, New York Times Co. v. United States, 403 U.S. 713, 728-730, 91 S.Ct. 2140, 2148-2149, 29 L.Ed.2d 822 (1971), (Stewart, J., concurring); Tribune Review Publishing Co. v. Thomas, 254 F.2d 883, 885 (C.A.3 1958); In the Matter of United Press Assns. v. Valente, 308 N.Y. 71, 77, 123 N.E.2d 777, 778 (1954). In Zemel v. Rusk, [381 U.S. 1, 16-17, 85 S.Ct. 1271, 1280-1281, 14 L.Ed.2d 179 (1965)], for example, the Court sustained the Government's refusal to validate passports to Cuba even though that restriction `render(ed) less than wholly free the flow of information concerning that country.' 381 U.S., at 16, 85 S.Ct., at 1281. The ban on travel was held constitutional, for `(t)he right to speak and publish does not carry with it the unrestrained right to gather information.' Id., at 17, 85 S.Ct., at 1281." [c.o., e.s.]
408 U.S. at 682-684, 92 S.Ct. at 2657-2658.
In deciding the issue presented, the Court explained:
"It is thus not surprising that the great weight of authority is that newsmen are not exempt from the normal duty of appearing before a grand jury and answering questions relevant to a criminal investigation. At common law, courts consistently refused to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury. [c.o.] In 1958, a news gatherer asserted for the first time that the First Amendment exempted confidential information from public disclosure pursuant to a subpoena issued in a civil suit, ... but the claim was denied, and this argument has been almost uniformly rejected since then.... These courts have applied the presumption against the existence of an asserted testimonial privilege, United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. *403 724, 730, 94 L.Ed. 884 (1950), and have concluded that the First Amendment interest asserted by the newsman was outweighed by the general obligation of a citizen to appear before a grand jury or at trial, pursuant to a subpoena, and give what information he possesses." [e.s.]
408 U.S. at 685-686, 92 S.Ct. at 2658-2659. Concluding this part of its analysis, the Court stated:
"A number of States have provided newsmen a statutory privilege of varying breadth, but the majority have not done so, and none has been provided by federal statute. Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do. Fair and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government, and the grand jury plays an important, constitutionally mandated role in this process. On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." [e.s.]
408 U.S. at 689-691, 92 S.Ct. at 2660-2661.
In a brief concurring opinion (which we quote in its entirety) Justice Powell wrote:
"Mr. Justice POWELL, concurring.
"I add this brief statement to emphasize what seems to me to be the limited nature of the Court's holding. The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources. Certainly, we do not hold, as suggested in Mr. Justice STEWART's dissenting opinion, that state and federal authorities are free to `annex' the news media as `an investigative arm of government.' The solicitude repeatedly shown by this Court for First Amendment freedoms should be sufficient assurance against any such effort, even if one seriously believed that the mediaproperly free and untrammeled in the fullest sense of these terms were not able to protect themselves.
"As indicated in the concluding portion of the opinion, the Court states that no harassment of newsmen will be tolerated. If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationship without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.*
* It is to be remembered that Caldwell asserts a constitutional privilege not even to appear before the grand jury unless a court decides that the Government has made a showing that meets the three preconditions specified in the dissenting opinion of Mr. Justice Stewart. To be sure, this would require a `balancing' of interests by the court, but under circumstances and constraints significantly different from the balancing that will be appropriate under the court's decision. The newsman witness, like all other witnesses, will have to appear; he will not be in a position to litigate at the threshold the State's very authority to subpoena him. Moreover, absent the constitutional preconditions that Caldwell and that dissenting opinion would impose as heavy burdens of proof to be carried by the State, the courtwhen called upon to protect a newsman from improper or prejudicial questioningwould be free to balance the competing interests on their merits in the particular case. *404 The new constitutional rule endorsed by that dissenting opinion would, as a practical matter, defeat such a fair balancing and the essential societal interest in the detection and prosecution of crime would be heavily subordinated.
In short, the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection."
408 U.S. at 709-710, 92 S.Ct. at 2671.
We do not share Judge Klein's characterization of Justice Powell's concurrence. Plainly Justice Powell did not state that he concurred in the result only, or that he believes that there is a privilege in favor of news correspondents to refuse to testify as to nonconfidential sources encountered while engaged in news gathering activities. Quite to the contrary, Justice Powell stated that his own observations were merely added to Justice White's opinion for the Court, thereby evincing his agreement with Justice White's opinion. Moreover, Justice Powell openly expressed his disagreement with Justice Stewart's dissenting opinion.
Nor have we been able to detect any attempt by the Court to limit, narrow or recede from its Branzburg holding. In Minnesota v. Murphy, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), Justice Marshall, one of the dissenters in Branzburg, stated in a dissenting opinion that:
"Our concern with the protection of constitutional rights should not blind us to the fact that, in general, governments have the right to everyone's testimony. E.g., Branzburg v. Hayes, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972)."
465 U.S. at 451, 104 S.Ct. at 1155 (Marshall, J., dissenting). See also Houchins v. KQED Inc., 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (no constitutional right to news sources, citing Branzburg); Zurcher v. Stanford Daily, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) (search of newspaper under search warrant proper; no requirement that reporter first be subpoenaed before search permissible under First Amendment; no showing that sources of news will dry up, citing Branzburg) (Powell, J, concurring); Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (no first amendment privilege in civil libel action against inquiry into editorial process and into state of mind of those who edit, produce or publish).
Zurcher is especially apt, for it upheld a search of a press office for evidence relevant to a crime, even though the possessor of the office was not implicated in the crime. The Court reiterated that the press has no special first amendment protections, different from the ordinary public, from the police use of warrants and subpoenas to access to evidence relevant to a criminal prosecution.
Perhaps Judge Klein's view is influenced by analyses about Branzburg, such as the following:
"Despite the holding in Branzburg and the discouraging tone of the majority opinion, lower federal courts have consistently read the case to support some kind of qualified privilege for reporters. [c.o.] The basis for this reading is that five justices in Branzburg explicitly acknowledged that the Constitution may at times protect the confidentiality of journalists' sources. Four justices dissented from the Court's decision: Justices Brennan, Marshall and Stewart would have recognized a qualified privilege, and Justice Douglas advocated absolute immunity. Concurring, Justice Powell argued that the first amendment hazards of compromising a reporter's confidences should be balanced on a case-bycase basis against the public's interest in criminal investigation, and suggested that courts should grant relief from questioning that `implicates confidential source relationships without a legitimate need of law enforcement.'"
Laurence H. Tribe, AMERICAN CONSTITUTIONAL LAW (2d ed. 1972). In a later passage, however, Professor Tribe wrote:
"In particular, qualified privileges of the sort rejected by the Court in Branzburg and Herbert are arguably required by the first amendment's implicit guarantee against undue interference with the acquisition of knowledge." [e.s.]
Id. at 976. It is obvious that Professor Tribe does not share the view that Branzburg stands for a qualified privilege even for confidential sources. And this points up the problem *405 with using in this case the sentiments suggested by Professor Tribe, i.e. that the proposed qualified privilege they discuss relates to confidential sources but not to non confidential sources, as here. There is no plausible rationale for barring a qualified privilege for confidential sources, but according such a privilege for non confidential ones.
Finally, as to Judge Klein's reliance on lower federal court precedents for his conclusion, including federal trial courts, we reaffirm the principle that a Florida District Court of Appeal takes its direction from the Florida Supreme Court on matters of federal law as to which the United States Supreme Court has not spoken definitively. See State v. Dwyer, 332 So.2d 333 (Fla.1976) (the only federal decisions binding upon the Florida state courts are those of the United States Supreme Court); Board of County Comm'rs v. Dexterhouse, 348 So.2d 916 (Fla. 2nd DCA 1977) (same); Brown v. Jacksonville, 236 So.2d 141 (Fla. 1st DCA 1970) ("A decision of a Federal District Court, while persuasive if well reasoned, is not by any means binding on the courts of a state. The Supreme Court of Florida is the apex of the judicial system of the State of Florida, and its decisions are binding upon this court."). In a system where the decisions of lower federal courts in Florida are not binding on the state courts, there may very well be occasions when the federal courts hold one way, while the state courts hold the contrary. That is after all a consequence of our system of dual sovereignty. The remedy is simple: the United States Supreme Court can eliminate the conflict by simply taking up an appropriate case for review.
We repeat. In Morejon, the Supreme Court of Florida held that "[T]here is no privilege, qualified, limited, or otherwise, which protects journalists from testifying as to their eyewitness observations of a relevant event in a subsequent court proceeding." [e.s.] 561 So.2d at 580. The court did not limit its holding to eyewitness observations of the commission of the crime itself. Instead it said that the principle applies to a "relevant event" that is later sought to be adduced in a court proceeding.[3]
While we also recognize that the issues in Branzburg and Morejon involved a reporter witnessing the actual commission of a crime, whereas the present case involves a reporter's conversation with an accused after the crime had already been committed and the accused was awaiting trial, we see no distinction for purposes of the claim of privilege made by the reporter here. Prosecutors most often seek to prove guilt of an accused by two primary kinds of evidence: eyewitness testimony as to the commission of the crime, and statements made afterwards by the accused that amount to an admission of guilt. Confessions are certainly on a par with eyewitness testimony as to proof of a defendant's guilt.
Moreover, to apply such a distinction leads to absurd results. Suppose for example that, while engaged in news gathering, a reporter stumbles into a nonconfidential setting in which he overhears a defendant expressly admit his guilt to another person. Under a qualified privilege, would the state be deprived of this evidence? Suppose instead in the same setting that the reporter overhears another defendant admitting that a co-defendant did not do the crime. Would that equally *406 be privileged when defense counsel subpoenas that reporter? We are simply unable to justify why no privilege exists as to the eyewitness but such a privilege should exist as to the admission.
No one would seriously suggest that an accused who grants a jailhouse interview to a newspaper reporter, after having previously given a confession to the police, harbors any illusion that his comments to the reporter will escape publication despite the absence of any agreement of confidentiality. This case thus vividly illustrates that nonconfidential sources willingly speak to the press for their own personal reasons. The mere fact that these reasons appear in retrospect to be illadvised when the comments are sought to be adduced in the criminal trial as admissions is surely no reason to shield the admissions with a reporter's privilege. The reporter here has made no plausible showing that even nonconfidential sources will dry up if not protected by a qualified privilege. To recur to Justice White, the press in this republic has thrived for more than 2 centuries without any protection of this kind for either confidential or nonconfidential sources.
Nor has this reporter articulated any special reason why there should be a privilege under the unique facts of this case. Although we do not suggest that the absence of these facts would necessarily implicate a privilege, we note that the trial judge carefully inquired into the prosecutor's purpose in seeking the reporter's testimony and concluded that the evidence sought to be elicited was relevant, probative and not for any improper purpose. In short, this was not an instance involving a tenuous connection with the pending charges, or of prosecutorial overreaching, or an improper purpose to burden, annoy, restrict or punish the reporter solely on account of some personal animus.
We also reject the reporter's contention that in determining whether there is a constitutional news gathering privilege to refuse to testify about relevant information in a criminal trial, the court must balance the factors in favor of testifying against the constitutional privilege. We believe that this contention turns the analysis on its head. As our supreme court said in Morejon,
"Holding that the limited and qualified privilege set forth by this Court in Morgan [v. State, 337 So.2d 951 (Fla.1976) ] and Huffstetler has absolutely no application in this case makes it unnecessary to balance the respective interests involved. See Huffstetler, 489 So.2d at 725 (Boyd, C.J., dissenting)."
561 So.2d at 580. This holding unmistakably makes clear that any balancing of interests occurs only after the privilege has been shown to exist. As no privilege was shown to exist in this case, the trial judge and this court have had no occasion to balance any interests of the reporter against the interests of the prosecution.
To enable the reporter to seek review in the supreme court we certify the same question as Judge Frank did in Davis v. State, 692 So.2d 924 (Fla. 2nd DCA 1997).
The finding of contempt and sentence are therefore
AFFIRMED.
GUNTHER, C.J., concurs.
KLEIN, J., concurs specially with opinion.
KLEIN, Judge, concurring specially.
The majority extensively quotes Branzburg and relies on those quotes for its conclusion that there is no privilege in the present case. Those quotes, however, from Justice White's opinion, were only agreed to by three other justices. That plurality opinion carried the day only because Justice Powell specially concurred, and his concurrence, along with the dissents, have been almost universally interpreted as providing a qualified privilege. Justice Powell wrote:
As indicated in the concluding portion of the opinion, the Court states that no harassment of newsmen will be tolerated. If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates *407 confidential source relationships without a legitimate need of law enforcement, he will have access to the Court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct.
408 U.S. at 709-710, 92 S.Ct. at 2671 (Powell, J., concurring).
The Florida Supreme Court so interpreted Branzburg, relying on Justice Powell's concurring opinion and the dissents, in Morgan v. State, 337 So.2d 951 (Fla.1976), recognizing the privilege and applying the balancing test. It also did so in Tribune Co. v. Huffstetler, 489 So.2d 722 (Fla.1986). Those cases, however, involved confidential information, and are thus not controlling here.
Of the five federal circuit courts of appeal which have considered the precise issue in this casewhether there is a qualified privilege for news sources obtained from nonconfidential sourcesfour have concluded that there is a qualified privilege subject to a balancing test. See Shoen v. Shoen, 5 F.3d 1289 (9th Cir.1993); United States v. LaRouche Campaign, 841 F.2d 1176 (1st Cir. 1988); von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 145 (2d Cir.), cert. denied, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987);. United States v. Cuthbertson, 630 F.2d 139 (3d Cir.1980), cert. denied, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981).
The only federal circuit court of appeal to not recognize a privilege has done so because it refused to interpret Justice Powell's concurring opinion and the dissents in Branzburg as recognizing a privilege in the first place. In re Grand Jury Proceedings, 810 F.2d 580 (6th Cir.1987). Our supreme court has already disagreed with that interpretation of Branzburg, as I noted earlier, in Morgan and Huffstetler.
Although the eleventh circuit has not decided the issue, the qualified privilege exists and the balancing test is used in the southern district of Florida. United States v. Blanton, 534 F.Supp. 295 (S.D.Fla.1982), aff'd, 730 F.2d 1425 (11th Cir.1984) (without discussion of the privilege). In holding that there was a qualified privilege, even though no confidential source of information was involved, the court relied on Cuthbertson and Loadholtz v. Fields, 389 F.Supp. 1299 (M.D.Fla.1975). The Blanton court quashed the subpoena on the reporter until the government met the three part balancing test which was discussed,[4] but rejected, by the four-judge plurality in Branzburg:
(a) The reporter has information relevant and material to proof of the offense charged or the defendant's defense;
(b) There is a compelling need for disclosure sufficient to override the reporter's privilege; and
(c) The party seeking the information has unsuccessfully attempted to obtain other sources less chilling of the First Amendment freedoms.
Blanton, 534 F.Supp. at 297.
After Mr. Kidwell was found guilty of indirect criminal attempt, and sentenced to be incarcerated seventy days on October 7, 1996, he filed a petition for habeas corpus relief in the United States District Court for the Southern District of Florida. Mr. Kidwell's request for immediate release from incarceration was granted by the federal district court on October 21, 1996, pending that court's application of the balancing test under the qualified privilege pursuant to Blanton.
I do not agree with the majority that Miami Herald Publishing Co. v. Morejon, 561 So.2d 577 (Fla.1990), is controlling, because in Morejon the journalist was an eyewitness to a police search and an arrest of the defendant, and our supreme court held only that there was no qualified privilege for "eyewitness observations of a relevant event in a subsequent court proceeding." Id. at 580. There is a significant distinction between *408 being an eyewitness to a news event and merely conducting an interview long after, such as was done in this case. See Commonwealth v. Lamb, 309 Pa.Super. 415, 455 A.2d 678 (1983) (police officer who arrived at scene after robbery had taken place is not an eyewitness).
Morejon, I believe, was carefully worded so that it would not be construed more broadly. Surely, if the supreme court in Morejon had intended its decision to apply to these facts, it would have addressed Blanton and Loadholtz, the two Florida federal district court decisions discussed above, which have been widely cited in other jurisdictions. The fact that Blanton, Loadholtz, and the federal courts of appeals' decisions consistent with them, were not even mentioned in Morejon, leads me to conclude that its holding is restricted to eyewitness situations.
In LaRouche, the defendant in a criminal case subpoenaed video tapes in the possession of NBC which had not been televised. NBC argued five First Amendment interests in support of its motion to quash the subpoena, and after disposing of the first, which is irrelevant here, the court observed through Judge Coffin:
The other four interests named are "the threat of administrative and judicial intrusion" into the newsgathering and editorial process; the disadvantage of a journalist appearing to be "an investigative arm of the judicial system" or a research tool of government or of a private party; the disincentive to "compile and preserve nonbroadcast material"; and the burden on journalists' time and resources in responding to subpoenas. There is some merit to these asserted First Amendment interests. We discern a lurking and subtle threat to journalists and their employers if disclosure of outtakes, notes, and other unused information, even if nonconfidential, becomes routine and casually, if not cavalierly, compelled. To the extent that compelled disclosure becomes commonplace, it seems likely indeed that internal policies of destruction of materials may be devised and choices as to subject matter made, which could be keyed to avoiding disclosure requests or compliance therewith rather than to the basic function of providing news and comment. In addition, frequency of subpoenas would not only preempt the otherwise productive time of journalists and other employees but measurably increase expenditures for legal fees. Finally, observing Justice Powell's essential concurring opinion in Branzburg, "certainly, we do not hold that state and federal authorities are free to annex the news media as an investigative arm of government." 408 U.S. at 709, 92 S.Ct. at 2671 (quotations omitted).
These are legitimate concerns. They must be balanced, however, against the defendants' interests. Cf. Greater Newburyport Clamshell Alliance v. Public Service Co. of New Hampshire, 838 F.2d 13, 20 (court should develop scope of discovery order by balancing importance of privilege asserted against defending party's need for the information to construct its most effective defense). At stake on the defendants' side of the equation are their constitutional rights to a fair trial under the Fifth Amendment and to compulsory process and effective confrontation and cross-examination of adverse witnesses under the Sixth Amendment. No one or all of NBC's asserted First Amendment interests can be said to outweigh these very considerable interests of the defendants. Cf. Branzburg v. Hayes, 408 U.S. at 690-91, 92 S.Ct. at 2661-62 ("public interest in law enforcement and in ensuring effective grand jury proceedings" outweighs asserted news gathering interests of reporter refusing to testify and expose confidential sources to grand jury).
LaRouche, 841 F.2d at 1182.
The LaRouche court relied on Blanton and Loadholtz, supra, as well as Cuthbertson, supra, in which the third circuit noted:
We do not think that the privilege can be limited solely to protection of [confidential] sources. The compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes. Like the compelled disclosure of confidential sources, it may substantially undercut the public policy favoring the free flow of information *409 to the public that is the foundation for the privilege. Therefore, we hold that the privilege extends to unpublished materials in the possession of CBS.
Cuthbertson, 630 F.2d at 147 (citations omitted).
I have no less concern for the rights of the government and the defendant to have access to evidence in criminal cases than my colleagues, but I see no harm in requiring the parties seeking the evidence to demonstrate that it passes the balancing test. Any inconvenience in that regard is outweighed, in my opinion, by the concerns expressed by the courts in LaRouche and Cuthbertson.
Finally, I cannot ignore the practical effect of the fact that federal district court judges in Florida have interpreted Branzburg to provide for a privilege for nonconfidential sources. Loadholtz, Blanton. This puts our state court trial judges in the awkward position of having to follow our precedent and hold these reporters in contempt, knowing that the reporters can make an end run around these orders by seeking relief in federal court. I am, of course, also bound to follow our precedent in Gold Coast Publications, Inc. v. State, 669 So.2d 316 (Fla. 4th DCA), rev. denied, 682 So.2d 1099 (Fla.1996). If it were not for that decision I would hold that there is a qualified privilege subject to a balancing test.
NOTES
[1] The reasons for the mistrial have nothing to do with the case we confront today.
[2] See United States v. Nixon, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108-3109, 41 L.Ed.2d 1039 (1974) (exceptions to the demand for every man's evidence are in derogation of the search for truth and thus are not lightly created or expansively construed); Miami Herald Pub. Co. v. Morejon, 561 So.2d 577, 581 (Fla.1990) ("The public `has a right to every man's evidence'.").
[3] At the beginning of its opinion in Morejon, the court said:

"We review Miami Herald Publishing Co. v. Morejon, 529 So.2d 1204 (Fla. 3d DCA 1988), in which the district court certified the following question as one of great public importance:
[W]hether a news journalist has a qualified privilege under the First Amendment to the United States Constitution, as interpreted by the Florida Supreme Court in Morgan v. State, 337 So.2d 951 (Fla. 1976) and Tribune Co. v. Huffstetler, 489 So.2d 722 (Fla.1986), to refuse to divulge information learned as a result of being an eyewitness to a relevant event in a criminal casei.e., the police arrest and search of the defendantwhen the journalist witnesses such an event in connection with a newsgathering mission.
Id. at 1205. We have jurisdiction. Art. V, Sec. 3(b)(4), Fla. Const. We answer the certified question in the negative and approve the district court's decision." [e.s.]
561 So.2d at 577. Contrary to Judge Klein's assertion, the supreme court did not approve a qualified privilege in Morejon. In Tribune Co. v. Huffstetler, 489 So.2d 722 (Fla.1986), and Morgan v. State, 337 So.2d 951 (Fla. 1976), however, the supreme court did approve a qualified privilege for confidential sources.
[4] Branzburg, 408 U.S. at 679, 92 S.Ct. at 2655-2656. Miller v. Transamerican Press, Inc., 621 F.2d 721 (5th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981), has generally been cited as establishing that test; however, Miller attributes it to Garland v. Torre, 259 F.2d 545 (2d Cir.), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958).